904 So.2d 816 (2005)
STATE of Louisiana
v.
Timothy TURNER.
No. 05-KA-75.
Court of Appeal of Louisiana, Fifth Circuit.
May 31, 2005.
*817 Paul D. Connick, Jr., District Attorney, 24th Judicial District, Parish of Jefferson, State of Louisiana, Terry M. Boudreaux, Anne Wallis, Kenneth Bordelon, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Jane L. Beebe, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY, and MARION F. EDWARDS.
JAMES L. CANNELLA, Judge.
The Defendant, Timothy Turner, appeals from his conviction of aggravated *818 rape of a female juvenile, in violation of La.R.S. 14:42. We affirm and remand.
The Defendant was charged with the offense on January 30, 2003, pled not guilty at his arraignment, and was tried on December 2, 2003 by a twelve-person jury. He was found guilty. On December 11, 2003, the trial judge sentenced the Defendant to life imprisonment without benefit of parole, probation, or suspension of sentence. This timely appeal followed.
In December of 2002, fifteen-year-old J.S.,[1] confined to a wheelchair from cerebral palsy, lived in an apartment in Harvey with her brother and her mother. In addition, the thirty-five year old Defendant, his wife, Othalene Turner, and his step-son, Charles Henry, Othalene's adopted child, also lived in the apartment.[2] The Turners had resided in the apartment since March of 2002. Charles Henry, who was "mildly mentally retarded," came to live at the apartment later in 2002. J.S. and her mother, Ms. S., slept in a bed in the downstairs living room. Charles Henry slept on the floor next to the bed.
On December 18, 2002, Ms. S. and Othalene went to Lafayette. J.S. testified that, on that particular night, the Defendant slept in the bed with her for the first and only time. J.S. awoke to find the Defendant on top of her. She asked the Defendant what he was doing. J.S. felt his penis go inside her vagina. J.S. testified that she tried, but was unable to push him off. She called out for her brother sleeping upstairs, but he did not come down. She also screamed Charles Henry's name. The third time she screamed for him, he came to help her. With Charles Henry's aid, she was able to break free from the Defendant. J.S. testified that the Defendant told her not to tell her mother. However, when her mother got home, J.S. told her mother to bring her to the hospital because the Defendant had raped her.
Ms. S. testified that when she returned to the apartment on December 19, she found J.S. sitting in her wheelchair by the door. J.S. started crying and said, "momma, I'm hurting." When Ms. S. asked what was wrong, J.S. replied, "Timothy raped me." J.S. and her mother went into the bathroom, where Ms. S. "checked her." Afterwards, Ms. S. called 911.
Ms. S. testified that J.S. told her that Charles Henry had witnessed what happened as he had been sleeping in his usual spot on the floor. Ms. S. spoke to Charles Henry, and his version of the events was consistent with J.S.'s version. Ms. S. confronted the Defendant, but he denied the allegations and told Ms. S. to call the police if she did not believe him.
According to Ms. S., she and Othalene had known each other for ten years, and had been "sexually involved from time to time." These sexual activities included the Defendant "[f]rom time to time," which took place at the apartment "[f]rom time to time." However, during the period of time she had known the Turners, Ms. S. never suspected them of making any sexual overtures toward J.S. Ms. S. testified that she had convictions for assault and battery and possession with intent to distribute marijuana.
Deputy Lyndon Schmitt and Detective Sergeant Terry Graffeo, Sr. of the Jefferson Parish Sheriff's Office (JPSO) responded to Ms. S's call. Deputy Schmitt *819 arrived between 2:00 and 2:30 a.m. Detective Graffeo arrived at approximately 2:45 a.m. Deputy Schmitt testified that he met with Ms. S. and then attempted to speak with J.S. However, J.S. was very upset, was crying and wanted her mother. The Deputy advised the Defendant of his constitutional rights, but told him that he was not under arrest at the time. Eventually, J.S. told Deputy Schmitt what had happened to her. Charles Henry told Deputy Schmitt that he witnessed the events. Deputy Schmitt spoke to the victim's brother, but he was not aware of what happened.
Detective Graffeo testified that J.S. was upset and crying when he arrived at the scene, but that he could understand some of the things that she told him. Detective Graffeo also spoke to the Defendant, who told the officer that he had been advised of his rights and that he understood them. The Defendant also told Detective Graffeo that he was a friend of the family, that he had slept in the bed with J.S. several times, and that his wife could confirm this information. The Defendant denied that he had any sexual relationship with J.S.
Detective Graffeo interviewed the Defendant's wife and Charles Henry, who gave tape-recorded statements to the officer. Othalene denied that the Defendant ever slept or lay in the bed with J.S. The detective estimated that the area where Charles Henry slept was approximately one foot from J.S.'s bed. After Detective Graffeo completed the interviews with the witnesses, the Defendant was arrested. At jail, the Defendant consented to search for physical evidence from his person.
Detective Graffeo brought J.S. and her mother to Children's Hospital, where J.S. related the events. There, the victim underwent an emergency room sexual assault examination. Dr. Scott Benton, an expert in the field of pediatric forensic medicine, testified that he reviewed J.S.'s records contained in the clinic's file. According to the emergency room records, J.S. told the emergency room doctor that her mother's friend's husband forced her down on a bed and put his "`private inside [her].'" Dr. Benton testified that, at a follow-up visit at the clinic two weeks later, J.S. gave an audio taped statement in which she said that the Defendant forced himself on her and put his "`penis up in [her] private part.'" She said she tried to push the Defendant off of her, that her hands were held back, and that she was screaming for her brother. She also said that "`[h]e tried to put his penis in [her] mouth,'" but that "`[she] wouldn't let him [.]'" Further, J.S. said that the defendant told her to shut up and not to tell her mother. She said that Charles Henry witnessed the rape incident.
The emergency room examiners concluded that J.S.'s vaginal examination was abnormal because of increased vaginal erythema, or redness, and an abnormal hymen, with "ragged remnants." However, based on his review of the emergency report and photographs of the victim's external genitals, Dr. Benton concluded that the examination was normal. Although the emergency room records reflected that there was a lesion of unknown etiology at the entrance of J.S.'s vagina, Dr. Benton did not classify the lesion as evidence of trauma because it could have resulted from other causes, explaining that he did not want to "overcall" the physical findings. He found no physical evidence of intercourse or rape in this case. However, he explained that it was common for physical findings to be lacking. In his experience, 90 percent or more of children alleging rape do not present with any physical findings. Dr. Benton testified that J.S.'s examination was in line with these cases.
*820 At trial, Charles Henry testified that he was 17 years old and that he slept on the floor next to J.S.'s bed. Charles Henry admitted that he talked to the police the night they were called out, but did not remember what he told them. He specifically did not recall telling the police that the Defendant had attacked J.S. Over the Defendant's objection, Charles Henry's taped statement to Detective Graffeo taken at 3:45 a.m. on December 19, 2002 was played for the jury. In this statement, Charles Henry said that he woke up when he heard J.S. screaming and that the Defendant pulled J.S.'s pants down and raped her. Charles Henry said that he tried to push the Defendant off J.S. Afterward, the Defendant pulled J.S.'s pants up and slept in the bed with her as if nothing had happened. Charles Henry said in his taped statement that the Defendant told him not to tell anyone what he had seen. When Charles Henry tried to call the police, the Defendant disconnected the telephone.
After the statement was played, Charles Henry testified that he had lied to the police in his statement because J.S. told him to lie. Charles Henry said that J.S. told him she had lied to the police and that nothing had happened. Charles Henry also denied that he had witnessed the Defendant rape J.S. Charles Henry said that he was in a special education class at Higgins in the eleventh grade. He also testified that he was not taking Prozac on December 18, 2002, but he was on kidney medication, which he had taken that day.
Othalene testified that J.S. sometimes slept in the bed with her and her husband in the apartment, and that J.S. had slept in the bed with her and her husband on several occasions before they moved to the apartment in Harvey. Turner testified that J.S. always slept in the bed with them when they were at the Sun Suites on Manhattan Boulevard.[3] However, Othalene was confronted with a transcription of her statement to Detective Graffeo in which she said that, since March of 2002, they had lived in three other places before moving to the apartment with Ms. S and her children. In the statement, she contended that the Defendant had never slept in the bed with J.S. there. In Othalene's statement, she said that the Defendant might sit or lay on J.S.'s bed when other people were present, but that he had never slept in the bed with J.S. overnight. Her statement also indicated that she had been shocked by J.S.'s allegations, because the Defendant had never gone downstairs to sleep with her before.
When asked why she had not told Detective Graffeo that the Defendant had previously slept in the bed with J.S., Othalene explained that it had not occurred to her at that time. She then testified that J.S. had in fact slept and lain in the bed with both her and the Defendant, but not overnight.
Othalene testified that Charles Henry was a truthful child, but had undergone some changes in 2000. After that year, he made up things and lied. According to Othalene, he had been placed in the New Orleans Adolescent Hospital because of a "mental breakdown," and had been released from the hospital the week before this incident. She said that Charles Henry has "psychosis NOS," and that he is not responsible for his actions or things that he says. She testified that she told Charles Henry to tell the truth at trial. According to Othalene, Charles Henry had been on medication since 2002, and was *821 currently on Prozac and Polycitrate for his kidneys. She claimed that Charles hallucinates when he misses his medicine. While Othalene did not see Charles Henry take his medicine on December 18, she said that he told her that he had taken it. Othalene admitted to a prior conviction of two counts of forgery and was currently on probation.
The Defendant testified at trial. He denied raping J.S. The Defendant admitted that he laid on the bed with J.S. that night and that Charles Henry was on the floor. They were listening to the radio, and then "we all went to sleep." The next morning, J.S.'s brother left for work. The Defendant went to work at 6:00 that evening. He came home later that night and went upstairs to lie down. His wife and Ms. S. returned home later. He learned that J.S. had told his wife and Ms. S. that he had raped her. When his wife came upstairs to ask him about it, the Defendant said that he denied any knowledge of what J.S. was talking about, and that he told Ms. S. to take J.S. to the hospital if Ms. S. did not believe him. The Defendant consented to give a deoxyribonucleic acid (DNA) sample in order to prove his innocence.
According to the Defendant, his wife was being paid to take care of J.S., and he assisted his wife with duties that she could not perform, such as lifting J.S. or carrying J.S. to the bathroom. He said that he would never have hurt J.S. The Defendant claimed that J.S. likes "special attention" and had been known to lie if things did not go her way. On cross-examination, he insisted that he did not sleep in the bed with J.S. on the night of December 18, 2002, emphasizing that he "laid" in the bed with her and that he slept upstairs, as always. The Defendant admitted to having a conviction for second degree battery.
Pamela Williams (Williams), a forensic serologist, was accepted as an expert in forensic science. She analyzed the sheets, pillow cases, and comforter that were collected from the victim's bed, and analyzed J.S.'s panties and her sexual assault kit. She also had reference samples from the Defendant, which included his hair, saliva, and blood. Williams testified that she found no seminal fluid on any of the evidence which she examined. However, Williams stated that in about half of the cases in which she examines a rape kit, she finds no seminal fluid. Williams found small stains, that might be blood, on the fitted sheet and two of the pillow cases, but there was an insufficient sample for analysis. In addition, Williams testified that there was possibly blood on J.S.'s underwear. The report indicates she found human blood on the comforter.
Bonnie Dubourg (Dubourg), an expert forensic DNA analyst, testified that she examined a cutting from J.S.'s panties and two vaginal swabs. According to Dubourg, she only found J.S.'s genetic profile on these items and there was no seminal fluid present. The experts' reports were introduced into evidence.
On appeal, the Defendant contends that the evidence was insufficient to support the jury's verdict of aggravated rape, because the only evidence of the rape was J.S.'s "unbelievable testimony."
The standard for appellate review of the sufficiency of evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Bailey, 04-85, p. 4 (La.App. 5th Cir.5/26/04), 875 So.2d 949, 954-955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476.
*822 In December of 2002, aggravated rape was defined in La. R.S. 14:42, in pertinent part, as follows:[4]
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.
(5) When two or more offenders participated in the act.
(6) When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.
B. For purposes of Paragraph (5), "participate" shall mean:
(1) Commit the act of rape.
(2) Physically assist in the commission of such act.
C. For purposes of this Section, the following words have the following meanings:
(1) "Physical infirmity" means a person who is a quadriplegic or paraplegic.
(2) "Mental infirmity" means a person with an intelligence quotient of seventy or lower.
La.R.S. 14:41 defines rape, in pertinent part, as follows:
A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.
The Defendant does not contest the sufficiency of the evidence as to the statutory elements of aggravated rape. Rather, he attacks the credibility of J.S.'s testimony. In support of his argument, he urges that he was only convicted because J.S. was a sympathetic witness who had lied to her mother and felt compelled to maintain the lie at trial. The Defendant also contends that his actions following the report of the rape, including telling J.S.'s mother to take J.S. to the hospital and voluntarily submitting to DNA testing, indicate that he was telling the truth. He asserts that the absence of evidence containing his DNA supports the conclusion that J.S. lied. The Defendant points to Dr. Benton's testimony that there was no evidence that J.S. had been raped, and to Charles Henry's testimony in which he recanted his earlier support of J.S.'s account of events. Under these circumstances, the Defendant contends that no rational truer of fact could have found him guilty beyond a reasonable doubt.
Our analysis of the sufficiency of the evidence does not include Charles Henry's recanted statement, because a prior inconsistent statement of a witness may be admissible only for impeachment purposes; *823 it cannot be used as substantive evidence of a defendant's guilt. See, State v. Cousin, 96-2973, pp. 9-11 (La.4/14/98), 710 So.2d 1065, 1069-1070. See also, State v. Noil, 01-521, p. 15 (La.App. 5th Cir. 12/26/01), 807 So.2d 295, 307, writ denied, 02-276 (La.App. 5th Cir.10/25/02), 827 So.2d 1177.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier-of-fact, is sufficient support for a requisite factual conclusion. State v. Robinson, 02-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79, cert. denied, ___ U.S. ___, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004). In the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. State v. Hotoph, 99-243, p. 17 (La.App. 5th Cir.11/10/99), 750 So.2d 1036, 1045, writ denied, 99-3477 (La.6/30/00), 765 So.2d 1062 and writ denied, 00-0150 (La.6/30/00), 765 So.2d 1066. In State v. Tapps, 02-0547 (La.App. 5th Cir.10/29/02), 832 So.2d 995, 1001, writ denied, 02-2921 (La.4/21/03), 841 So.2d 789, this Court held that the juvenile victim's testimony alone, even absent any additional physical evidence, was sufficient to establish the elements of the offense of forcible rape.
From the date of the incident, J.S. continuously maintained that the Defendant raped her, despite her resistance. The details of the incident were consistent when she told her mother right after the event, the police officers, the doctors, and in her audio taped statement two weeks after the incident. At trial, J.S. testified that she knew that she had sworn to tell the truth, that she was telling the truth, and that if she did not tell the truth, God would not be happy with her. Her testimony and the Defendant's version of the events were in conflict.
The jury made a credibility determination and obviously believed J.S.'s version of the events over the Defendant's version. When the trier-of-fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. Bailey, 04-85 at 4, 875 So.2d at 955. It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence. State v. Marcantel, 00-1629, p. 9 (La.4/3/02), 815 So.2d 50, 56; Bailey, 04-85 at 5, 875 So.2d at 955. Viewed in the light most favorable to the prosecution, we find that the State proved the essential elements of the crime beyond a reasonable doubt.

PATENT ERROR
The record was reviewed for patent errors in accordance with La.C.Cr.P. art. 920. State v. Oliveaux, 312 So.2d 337, 338 (La.1975); State v. Frazier, 03-1219, p. 8 (La.App. 5th Cir.3/30/04), 870 So.2d 1075, 1079; writ denied 04-1290 (La.10/29/04), 885 So.2d 584. We find three errors.
First, the trial judge failed to completely advise the Defendant of the prescription period for filing an application for post-conviction relief. La.C.Cr.P. art. 930.8(A) provides that the prescriptive period for filing an application for post-conviction relief is "two years after the judgment of conviction and sentence has become final[.]" Subpart C of the article requires that the trial judge inform the defendant of the prescriptive period at the time of sentencing. Although the commitment indicates that the trial judge fully advised the Defendant of the prescriptive period in Article 930.8, the transcript *824 reflects that the trial judge failed to inform the Defendant that he had two years from the date his conviction and sentence becomes final to file for post-conviction relief. Where there is a discrepancy between the transcript and the minute entry, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La. 1983). Thus, according to our policy, we will order the trial judge to correctly advise the Defendant of the two year prescriptive period in conformity with C.Cr.P. art. 930.8, by sending written notice to the Defendant within ten days after the rendition of this opinion and to file written proof in the record that the Defendant received such notice. See: State v. Esteen, 01-879, p. 28 (La.App. 5th Cir.5/15/02), 821 So.2d 60, 78.
Next, we note that the Defendant's conviction is defined as a sex offense by La. R.S. 15:541(14.1). La. R.S. 15:542 provides registration requirements for sex offenders. In addition, R.S. 15:543 mandates the court to notify a defendant charged with a sex offense in writing of the registration requirements, as follows:
§ 543. Offender notification
A. The court shall provide written notification to any defendant charged with a sex offense of the registration requirements of R.S. 15:542. Such notice shall be included on any guilty plea forms and judgment and sentence forms provided to the defendant.
This Court has held that, like the omission of the La.C.Cr.P. art. 930.8 notification, this omission warrants a remand for written notification and we generally remand with an order for the trial judge to inform defendant of the registration requirements as provided in La. R.S. 15:543(A), by sending appropriate written notice to the defendant, within ten days of this Court's opinion, and to file written proof in the record that defendant received such notice. See, State v. Stevenson, 00-1296, p. 4 (La.App. 5th Cir.1/30/01), 778 So.2d 1165, 1166-1167.
A second registration requirement in La. R.S. 15:542.1 is entitled "Registration of sexually violent predators and child predators." That statute provides that "[a]ny person convicted of a sex offense as defined in R.S. 15:541(14.1) or of a criminal offense against a victim who is a minor as defined in R.S. 15:541(9) after July 1, 1997, shall have the duty to register and report under the provisions of this Chapter." La. R.S. 15:542.1(C) provides for a person defined as a sexual predator to be notified of the registration requirements, as follows:
C. Notice to the offender. If a person who is required to register under this Section is released from prison, or placed under parole, supervised release, or probation, a Department of Public Safety and Corrections officer, or the court if the offender is not placed in the jurisdictional custody of the Department of Public Safety and Corrections, shall:
(1) Inform the person of the duty to register and report, and obtain the information required for such registration.
Thus, 15:543(A) requires the trial court to notify a defendant charged with a sex offense of the registration requirements of R.S. 15:542, while the predator registration statute, 15:542.1(C) requires, among other things, notification by the Department of Corrections, upon release, or the court, when the offender is not placed in the jurisdictional custody of the Department of Public Safety and Corrections. In accordance with our decisions in State v. Thompkins, 04-1062 (La.App. 5th Cir.2/15/05), 896 So.2d 1165; State v. Carter, 04-482, p. 17 (La.App. 5th Cir.10/26/04), 888 So.2d 928, 939; and State v. Myles, 04-434, p. 14 (La.App. 5th Cir.10/12/04), 887 So.2d 118, 127, we will *825 remand for the trial judge to provide written notice of the general sex offender registration provisions of R.S. 15:543 and the provisions of R.S. 15:542.1.
Accordingly, the Defendant's conviction and sentence are affirmed. The case is remanded with an order to the trial judge to advise the Defendant of the two year prescriptive period for filing post-conviction relief under La.C.Cr.P. art. 930.8 and its time of commencement, by sending written notice to the Defendant within ten days after the rendition of this opinion and to file written proof in the record that the Defendant received such notice. In addition, the trial judge is ordered to advise the Defendant of the registration requirements of La. RS. 15:542.1 and R.S. 15:543, within ten days after rendition of this opinion and to file written proof in the record that the Defendant received such notice.
CONVICTION AND SENTENCE AFFIRMED; CASE REMANDED.
NOTES
[1] The victim is identified by her initials because she was a minor and the victim of a sex crime. See, La.R.S. 46:1844(W). The victim's mother's initial is used to protect the victim's identity.
[2] Othalene Turner testified that Charles Henry was actually her first cousin, whom she adopted in 1991 so he would not go into foster care.
[3] Othalene's testimony is not clear regarding who lived with her and the Defendant at the Sun Suites.
[4] Acts 2003, No. 795, § 1 substituted "thirteen years" for "twelve years" in paragraph (A)(4).