924 So.2d 282 (2006)
STATE of Louisiana
v.
Royal CLARK.
No. 05-KA-652.
Court of Appeal of Louisiana, Fifth Circuit.
February 14, 2006.
*283 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Paige Cline, Assistant District Attorney, Parish of Jefferson, Gretna, Louisiana, for Plaintiff/Appellee.
Dwight M. Doskey, New Orleans, Louisiana, Robert Jenkins, Jr., New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, WALTER J. ROTHSCHILD, and SAM A. LeBLANC, III, Pro Tempore.
JAMES L. CANNELLA, Judge.
The Defendant, Royal Clark, appeals from his conviction of armed robbery. We affirm and remand.
The Defendant was charged on February 21, 2002 with armed robbery, a violation *284 of La.R.S. 14:64. He pled not guilty on April 23, 2002 and then filed various pre-trial motions. A hearing on the motion to suppress the identification was held on July 17, 2002 and denied. On June 26, 2003, the Defendant was tried by a jury. The Defendant was found guilty as charged.
On October 8, 2003, the Defendant filed a motion for post-verdict judgment of acquittal and a motion for a new trial. Both were denied on February 11, 2004. On that date, the Defendant was sentenced to imprisonment at hard labor for 49½ years, without benefit of parole, probation or suspension of sentence. On May 27, 2004, the Defendant filed a timely motion for an out-of-time appeal. The appeal was granted on June 1, 2004.

FACTS
On November 30, 2001, the Burger King Restaurant at 580 Terry Parkway in Jefferson Parish was robbed by an armed gunman. Deputy Paul Sperandeo, one of the first officers on the scene, testified that he received the armed robbery alert at about 11:00 p.m.[1] The employees working at the time were Claudia Pierce (Pierce),[2] Paula Murray (Murray),[3] Linda Gail Johnson (Johnson), Adrian Wheeler (Wheeler), Merika Simmons (Simmons),[4] Kinesha Jessy (Jessy) and William Steele (Steele).[5]
According to the witnesses, at closing time, Pierce, the manager, went to lock the front door. Before she could do so, a man instructed her not to lock-up, go to the back, and give him the money. At that point, he pulled a gun from under his clothes. Pierce went to the office in the back of the business as ordered. Steele also went to the office, advising the other employees that they were being robbed. Holding the gun, the robber told Pierce to open the safe, demanded the money and told her not to look at him. She did as he instructed. The robber then pointed the gun at Wheeler, who was working the drive-through window. Following his order, Wheeler helped the robber remove the money from her cash register. Thereafter, the robber forced all of the employees to the back of the restaurant and told them to get on the floor. He then left the premises.
Jessy was stationed at the front register. She saw the robber tell the manager to open the safe and take the money. Thereafter, he came back to the front holding a gun where he told Jessy to open the front registers. Jessy also said he had a gun. After he took the cash from the registers, he told her to return to the back. Jessy thought the robber must have had the gun under his shirt when he entered the premises. She said it was a black medium sized gun, with a long clip attached. Jessy remembered that she served the man food before the robbery, but he did not speak when ordering. Instead, he pointed to the menu for his selections. However, while he was eating, she noticed that he kept looking at her, and around the restaurant.[6]
*285 Murray, Johnson, and Jessy testified that three young children were also in the restaurant during the robbery. They stated that the children were still there when the police arrived. Wheeler did not remember anyone except the employees of the restaurant. However, she was working at the drive-through window and would not have known who else was there.
On appeal, the Defendant contends that the evidence was insufficient to identify him as the perpetrator of the crime and that the trial judge erred both in denying a mistrial following certain comments by a witness and in overruling the Defendant's objection to the expert testimony given by the investigating officer.

IDENTIFICATION
The Defendant argues that there was insufficient evidence to convict him since the witnesses gave different descriptions of the robber.
The standard for appellate review of the sufficiency of evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Bailey, 04-85, p. 4 (La.App. 5th Cir.5/26/04), 875 So.2d 949, 954-955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476.
In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the perpetrator's identity. State v. Ingram, 04-551, p. 7 (La.App. 5th Cir.10/26/04), 888 So.2d 923, 926. When the key issue is identification, the State must negate any reasonable probability of misidentification in order to carry its burden of proof. Id.
After the robbery, police officers showed Jessy three photographic line-ups. She positively identified the Defendant as the perpetrator in the one shown to her on January 30, 2002.[7] At trial, Jessy identified the Defendant as the perpetrator of the robbery, and the person she picked out in the photographic lineup. At the conclusion of her testimony, the Defendant was asked to stand. She identified the Defendant again, stating that she was sure this was the man who robbed the Burger King.
Jessy testified that she had gotten a good look at the Defendant during the robbery. He ordered food from her, he kept looking at her while he ate, and was only approximately three feet away from her during that time. She remembered what he ordered. In addition, she saw the events transpiring in the office. She saw the Defendant again when he returned to the restaurant area, told her to open the front registers and took the money from her. She was able to describe both the gun and the perpetrator.
Jessy said that the robber wore a long-sleeved pullover sweater with a hood, a hat and a wig. He did not wear sunglasses and did not have a mustache. According to Jessy, the robber was average height, about 5'8, a little shorter than her height of 5'8 or 5'9, had a dark complexion, darker than hers, and that his age was somewhere in the mid-20s to 30s. Jessy explained that she considers a man short if he is shorter, the same height, or an inch taller than her. She further testified that the Defendant did not have his hand over his mouth the whole time. She was sure that she told the first officer that the robber was wearing a wig.
*286 Simmons positively identified the Defendant in the photographic lineup as the perpetrator. During trial, Simmons was asked if she saw the person in the courtroom that she picked in the photographic lineup. She replied no, but admitted that the photograph of the Defendant that she picked out in the line-up looked like the person that robbed the restaurant.
Simmons testified that she was about five feet away from the robber and looked him directly in the face. Although she was frightened when she saw the gun, she did not stop looking at him. She described the perpetrator as tall, dark-skinned, stout, and wearing a hat and a wig. She said that his complexion was darker than hers. Simmons said that the robber was not wearing glasses, did not have his hands over his mouth during the robbery, and did not have a mustache or any hair about his lip. She did not recall if he was wearing a hooded sweatshirt. Simmons guessed that he was wearing a short-sleeved shirt, because she remembered that he had muscular arms. Initially Simmons stated that she was 100% positive the robber did not have tattoos on his arms. However, she later testified that she did not remember if the robber's shirt was short or long-sleeved, and did not remember if she looked at his arms.
The investigating officer, Detective Jeffrey Rodrigue, testified that on the date of the robbery, each employee consistently described the robber as a black male, about 5'8" with a husky build and gold teeth, and that he possibly had a piece of paper in his mouth at the bottom part of his teeth.[8] One employee thought that the robber might have been wearing a wig. The Detective said that the Defendant was 24 years old at the time of the robbery.
The other witnesses could not positively identify the Defendant's face, but were able to give general descriptions that were mostly consistent.
Wheeler said that the robber was of medium height (5'6" or 5'7"), was wearing a wig and a hat, was approximately 28-30 years old, and was not wearing sunglasses. Wheeler recalled giving a taped statement to Detective Rodrigue at her house in which there was no mention that the robber was wearing a wig. However, she noted that nothing in the statement indicated that Detective Rodrigue asked about a wig. Wheeler believed that she had discussed the wig with the Detective at other times. Wheeler could not make a positive identification from the photographic line-up, because she only got a brief look at the robber. Although Wheeler was about 12 feet away from Pierce and the robber when they were in the office, and he pointed the gun at her when they went to the front of the restaurant, Wheeler tried not to look directly at the robber, because she was scared.
Detective Rodrigue took a statement from Wheeler regarding the tentative identification at her home. The Detective testified that Wheeler was not sure of her identification because she only got a brief look at him. However, when Wheeler was shown the lineup, she immediately pointed to the Defendant's picture. Although Wheeler thought that the Defendant was the robber, she was not 100% positive.
Pierce could not identify the robber from the photographic lineup or at trial, because the robber ordered her not to look at him, she was frightened, and she concentrated on retrieving the money so he would leave before anyone was hurt. Pierce only noticed that he was a black man wearing a wig and hat.
*287 Murray did not get a good look at the robber, because she followed his instructions to lie on the floor and not look up. Murray was scared and her attention was on the gun. However, she did recall that the robber was a heavy set man wearing a wig. She also remembered that he had dark glasses and a hat. She thought that his complexion was a little darker than hers. When she was shown the photographic lineup, she picked out one picture of a man with a dark complexion that she "kind of" thought was the robber. During trial, the Defendant stood up for Murray to look at him. Murray testified that the robber was a little darker than the Defendant.
Johnson was not able to identify the robber's face when she was shown the photographic lineup, because her back was to him and Pierce when the robber and Pierce were in the office. She was scared and purposely avoided looking at the robber's face. Johnson could not remember if he had a hat, but described him as black, with a dark complexion, short for a man, but a little taller than her height of 5'2", and in his thirties. She further testified that the robber wore glasses or sunglasses.
Deputy Paul Sperandeo testified that the witnesses described the robber as 5'6" to 5'8", 160 pounds, male, black, with a medium to dark complexion, having gold teeth, and wearing a blue hooded sweatshirt. According to Deputy Sperandeo, all the witnesses' versions of the robbery, and their descriptions of the robber were consistent. In his report, he wrote that all six people could identify the robber. However, in the narrative section, he stated that two or three witnesses were unsure if they could identify him. In the police report, he wrote the reference to bottom gold teeth. Like Detective Rodrigue, he said that he described the robber as "husky," a term not used by the witnesses. Deputy Sperandeo did not recall any witness say that the robber was wearing a wig.
All of the witnesses denied telling the deputy that the robber had gold on his teeth or in his mouth. They testified that they did not notice any gold, because of where they were looking (Johnson), because he had his hand over his mouth (Murray), or because he had his teeth covered with something (Johnson, Wheeler, Simmons, and Jessy). Johnson, Wheeler, Simmons, and Jessy testified that the robber had a white substance that looked like tissue paper covering his teeth.
Catherine Clark (Clark), the Defendant's mother, testified that her son has always had a mustache until the time he was arrested. She also testified that the Defendant had tattoos all over his arms, which he had prior to the robbery. Clark said that the Defendant has had gold caps across the top of his mouth since he was in high school, but has never had them on the bottom teeth. The Defendant was asked to smile for the jury and it was stipulated that he did have tattoos completely covering both of his arms from his wrists to his shoulders.
"In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier-of-fact, is sufficient support for a requisite factual conclusion." State v. Robinson, 02-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79, cert. denied, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004); State v. Turner, 05-75, pp. 11-12 (La.App. 5th Cir.5/31/05), 904 So.2d 816, 823. It is not the function of the appellate court to assess the credibility determinations of the trier of fact or to reweigh the evidence. State v. Marcantel, 00-1629, p. 9 (La.4/3/02), 815 So.2d 50, 56; Turner, 05-75 at pp. 12-13, 904 So.2d at 823.
*288 The Defendant was positively identified in two out-of-court photographic lineups, and tentatively identified in another. Jessy was the only witness to positively identify the Defendant in the courtroom as the person who robbed them. However Jessy got a good look at the person who robbed them. She was very close to him. Because of this, she was also able to testify in detail about the gun, and the type of food the robber ordered from her.
Although the Defendant's arms are covered in tattoos and no witness described the robber as having any tattoos, several witnesses testified that the robber was wearing a long-sleeved sweatshirt. In addition, even though the Defendant has gold teeth in the top of his mouth, several witnesses testified that the robber had something in his mouth so that they could not see his teeth.
There were some discrepancies in the descriptions given by the witnesses. However, some witnesses were in a better position to observe the robber than others. Although the Defendant's mother testified that the Defendant always had a mustache and no witness at trial recalled the robber having a mustache, the jury was free to reject the testimony of any witness. Based on the verdict, the jury chose to believe Jessy's testimony.
We cannot re-weigh the credibility of the witnesses. Marcantel, 00-1629 at p. 9, 815 So.2d at 56; Turner, 05-75 at pp. 12-13, 904 So.2d at 823. Furthermore, there is no internal contradiction or irreconcilable conflict with physical evidence in this case. Thus, Jessy's testimony alone is sufficient to support the identification. See: Robinson, 02-1869 at p. 16, 874 So.2d at 79. Viewing the evidence then, in the light most favorable to the prosecution, we find that any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt. Therefore, there was sufficient evidence against the Defendant to convict him.

MISTRIAL
The Defendant argues that the trial judge erred in denying his motion for a mistrial when the prosecutor and police officer deliberately attempted to prejudice his right to a fair trial with references to other crimes evidence, a reference by the police officer to the Defendant's "rap sheet" and his comment that the Defendant became a suspect due to information from a confidential informant. The State responds that there has been no showing that a mistrial was warranted since the officer did not make any reference to a specific crime and is not a court official for purposes of La.C.Cr.P. art. 770. In addition, the State argues that the Defendant failed to request an admonition and there has been no showing of abuse of the trial judge's discretion. We agree.
During the State's re-examination of Detective Rodrigue, he was asked why he did not execute a search warrant on the Defendant's home or car. The Detective stated that: "[t]he information that we received from a confidential source stated he was not living at the address listed on his rap sheet, and therefore I had ." The Defendant immediately objected, the jury exited the courtroom and the Defendant moved for a mistrial. He argued that the jury now knew that he had a prior criminal record because the detective used the term "rap sheet." The trial judge denied the motion, and the Defendant again objected.
Generally, evidence of other crimes committed by a criminal defendant is inadmissible at trial due to the risk of grave prejudice to the defendant. State v. Williams, 01-1007, p. 7 (La.App. 5th Cir.2/26/02), 811 So.2d 1026, 1030. La. C.Cr.P. art. 770 mandates a mistrial upon *289 the defendant's motion, "when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to . . . [a]nother crime committed or alleged to have been committed by the defendant as to which evidence is not admissible [.]" La.C.Cr.P. art. 770(2).
Mistrial is a drastic remedy and should be employed only where remarks are so substantially prejudicial and potentially damaging to a defendant's rights that even jury admonition could not provide a cure. State v. Edwards, 97-1797, p. 19 (La.7/29/99), 750 So.2d 893, 906, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999); Williams, 01-1007 at p. 7, 811 So.2d at 1030.
A police officer is not a "court official" for purposes of La.C.Cr.P. art. 770. State v. Walker, 03-1072, p. 4 (La. App. 5th Cir.12/30/03), 865 So.2d 172, 174, citing State v. Hayes, 414 So.2d 717, 721 (La.1982); State v. Celestine, 98-1166, p. 7 (La.App. 5th Cir.3/30/99), 735 So.2d 109, 114, writ denied, 99-1217 (La.10/8/99), 750 So.2d 178. However, an impermissible reference to another crime which was deliberately elicited by the prosecutor is imputable to the State, and triggers the provisions of La.C.Cr.P. art. 770. State v. Walker, 03-1072 at p. 7, 865 So.2d at 174.
In Edwards the Court held:
[A] comment must not "arguably" point to a prior crime; to trigger mandatory mistrial pursuant to Article 770(2), the remark must "unmistakably" point to evidence of another crime. State v. Babin, 336 So.2d 780 (La.1976) (where reference to a "mug shot" was not unmistakable reference to a crime committed by Defendant); State v. Harris, 258 La. 720, 247 So.2d 847 (1971) (where no crime was evidenced by a police officer's reference to obtaining Defendant's photograph from the Bureau of Investigation). In addition, the imputation must "unambiguously" point to the Defendant. State v. Edwards, 406 So.2d 1331, 1349 (La.1981), cert. denied sub nom. Edwards v. La., 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). The Defendant has the burden of proving that a mistrial is warranted.
Edwards, 97-1797 at p. 20, 750 So.2d at 906. See also: Williams, 01-1007 at p. 8, 811 So.2d at 1030-1031
In Edwards, the Louisiana Supreme Court found that a detective's response to the prosecution's question that he found out that a certain location was the defendant's residence "[t]hrough the probation officer" did not warrant a mistrial. The Court found that the context of the State's line of questioning did not reveal an intent to elicit inadmissible evidence, and furthermore, the response did not unambiguously point to another crime committed by the defendant. Since the elements of La.C.Cr.P. art. 770(2) had not been satisfied, the defense failed to prove entitlement to a mandatory mistrial. In addition, the Court found that the defendant was not entitled to a mistrial under La.C.Cr.P. art. 771.[9] The Court noted *290 that the defendant failed to ask for an admonishment to the jury. The Court concluded that the trial judge did not abuse his discretion in denying the mistrial.
In Walker, a police officer made repeated indirect references to his familiarity with the defendant and observation of him on other occasions. We found that the comments did not constitute a reference to other crimes within the meaning of La.C.Cr.P. art. 770(2), because there was no evidence that the prosecutor was attempting to elicit information about other crimes. Rather, the questioning was aimed at setting up the sequence of events leading to the defendant's arrest. Further, we noted that there was no specific mention of a prior crime or bad act.
In Celestine, a police officer testified regarding the defendant's identification and stated in response to questioning at trial that when he got the defendant's name he ran it through the national crime computer and got a past criminal history. Thereafter, the defense moved for a mistrial. This Court affirmed the trial court's refusal to grant the defendant a mistrial and held that the officer did not refer to any specific crime committed by the defendant. This Court noted that, although the defense moved for a mistrial, no admonition was requested and, therefore, the trial judge was not obligated to admonish the jury.
In the present case, Detective Rodrigue was not a court official and there is no indication that the prosecutor was attempting to elicit other crimes evidence. The Detective did not refer to any specific crime committed by the Defendant. He merely stated that the Defendant had a rap sheet. Further, defense counsel did not request an admonishment to the jury by the trial court. "Whether a mistrial should be granted is within the sound discretion of the trial court, and denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion." Edwards, 97-1797 at p. 23, 750 So.2d at 908. Under these circumstances, we find no abuse of the trial judge's discretion in refusing to declare a mistrial.

EXPERT TESTIMONY
The Defendant next asserts that the trial judge erred in overruling his objection to the investigating officer giving expert testimony regarding Deoxyribonucleic Acid (DNA) evidence because he was not qualified as an expert in the field. However, the record shows that the defense opened the door as to the line of questioning. Furthermore, his response did not require the scientific gatekeeping of a Daubert[10] hearing. Even if it had, the Defendant waived his right to complain since he did not request a Daubert hearing.
As we noted in footnote 6, supra, the cup used by the robber was not submitted for DNA testing. When the State asked the Detective Rodrigue why not, he responded that the cup was dusted for fingerprints and the dust would alter the chemicals that make up the DNA. Thereafter, the following exchange took place between defense counsel and the court:

*291 Mr. Williams: Judge, I don't think he is qualified to say that. That would call for a scientific person.
Court: I don't believe.
Mr. Williams: Unless he has specific training.
Court: I think that goes right along with part of the cross. That's overruled.
La.C.E. art. 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Generally, lay witnesses are permitted under La.C.E. art. 701[11] to express opinions or inferences which are rationally based on that witness's perceptions and which are helpful to a clear understanding of his testimony. State v. Howard, 98-0064, pp. 27-28 (La.4/23/99), 751 So.2d 783, 813, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999). Further, law enforcement officers and correction officers have been allowed to testify regarding matters learned through their experience, without qualification as an expert. Id.
In State v. Decay, 01-192, p. 26 (La.App. 5th Cir.9/13/01), 798 So.2d 1057, 1073-1074, writ denied, 01-2724 (La.8/30/02), 823 So.2d 939, the defendant argued that an officer gave opinion testimony on matters that required expertise when he testified regarding two telephone conversations he heard which disclosed the defendant's desire to buy cocaine. This Court noted that the issue was precluded for appellate review since the defendant failed to object when the state asked the officer for his perception of the content of a conversation. Nevertheless, the Court further noted that this type of testimony was permitted under La.C.E. art. 701 and that the trial judge properly allowed the officer to testify to inferences regarding the content of the recorded conversations based on his own observations and experience.
In State v. Hunt, 34,945, p. 6 (La.App. 2nd Cir.9/26/01), 797 So.2d 138, 143, on cross-examination the defense counsel asked an officer who apprehended the suspect whether any fingerprints had been lifted from the victim's car, boots, inside the vehicle, or from the compact disc player. The officer responded that none had. The state asked the officer on redirect examination "what it takes to actually recover fingerprints from a vehicle." At that time, the defense counsel objected, arguing that the officer was not qualified as an expert on raising fingerprints. The trial judge overruled the objection. The officer then explained that what he meant by saying no prints were recovered is that the technique the police used was unable to detect or "lift" any fingerprints from the scene and further testified that it is often difficult to lift fingerprints from plastic surfaces, like the interior of a car. On appeal, the Second Circuit held that the prosecution's question was permissible. The court explained that an officer may testify to matters within his personal knowledge, acquired through his experience, without first being qualified as an expert. In addition, the court noted that the defense opened the door to the line of *292 inquiry and that no prejudice was caused by the subsequent clarification of the officer's earlier testimony.
In the present case, the Defendant did not request a Daubert hearing, and also initially raised the matter of DNA testing. Although the Defendant's failure to request a Daubert hearing would preclude appellate review of the issue, we noted that there is no merit to the argument. After the Defendant asked the detective on cross examination whether the cup was tested for saliva for DNA purposes and the detective answered no, defense counsel asked a follow up question. The State objected regarding the detective's qualifications as an expert on DNA evidence, and the trial judge sustained the objection. Thereafter, defense counsel questioned the detective about his training in DNA evidence, and the reliability of positive DNA matches. Defense counsel further asked the detective if he had requested that the drinking cup be tested for DNA. The detective replied that he had not. On redirect, the State simply asked the Detective why not. Thus, the Defendant opened up this line of questioning. Furthermore, the witness was not testifying as an expert in the science of DNA evidence. The content of his testimony was related to matters within his personal knowledge acquired through his experience as an officer.[12] The testimony was permissible under La. C.E. art. 702.

ERROR PATENT DISCUSSION
The record was reviewed for patent errors in accordance with La.C.Cr.P. art. 920. State v. Oliveaux, 312 So.2d 337, 338 (La.1975); State v. Frazier, 03-1219, p. 8 (La.App. 5th Cir.3/30/04), 870 So.2d 1075, 1079; writ denied 04-1290 (La.10/29/04), 885 So.2d 584. We find several errors, but only one requiring correction.[13]
The trial judge failed to advise the Defendant of the two-year prescriptive period for filing an application for post-conviction relief, as required by La.C.Cr.P. art. 930.8. We will, therefore, remand the case with instructions to the trial judge to send written notice to the Defendant within ten days of the rendition of this opinion of the prescriptive period for post conviction relief, and to file written proof in the record that the Defendant received the notice. See: State v. Stewart, 04-1231, p. 15 (La.App. 5th Cir.4/26/05), 902 So.2d 440, 449.
Accordingly, the Defendant's conviction and sentence are hereby affirmed.
AFFIRMED.
NOTES
[1] The record reflects that about $4,200 was stolen.
[2] Pierce was referred to by some employees as "Ms. Jean."
[3] Murray and Johnson were working across from each other in the kitchen by the office.
[4] The witness's name is spelled "Marika" in the police report, and on the back of the lineup photographs.
[5] Steele is referred to by some employees as "pawpaw." He was unable to identify the perpetrator, and did not testify at trial.
[6] One of the witnesses said that the robber was drinking from a cup before the robbery. It was dusted for fingerprints, but the results were not usable for identification purposes. The cup was not tested for DNA evidence. See discussion below at "Expert Testimony."
[7] Jessy's last name is spelled "Jessie" on the signature on the back of the lineup and the police report.
[8] He admitted that the term "husky" was his term.
[9] La.C.Cr.P. art. 771, in pertinent part, provides,

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
. . . .
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
[10] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[11] La.C.E. art. 701 provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
(1) Rationally based on the perception of the witness; and
(2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.
[12] The trial transcript does not reflect the officer's years of experience, but the detective stated that he had received DNA training.
[13] Two errors were noted that do not require action, but warranted a comment. First, the trial judge granted the Defendant's second motion for new trial on June 1, 2004 after the court had been divested of jurisdiction to grant a new trial. See: La.C.Cr.P. art. 916. No new trial was held according to the record. Since neither party refers to this oversight, we conclude that the error was noticed and ignored since it was an obvious mistake.

In addition, there is a problem with the second motion to reconsider the sentence. However, we need not address this problem as the record does not clearly reflect that this motion was timely filed within thirty days of the imposition of the Defendant's sentence in accordance with La.C.Cr.P. art. 881.1, the issue was not raised in this appeal, and the Defendant does not challenge his sentence on appeal.