914 So.2d 574 (2005)
STATE of Louisiana
v.
Tracy ALBERT.
No. 2004-KA-2098.
Court of Appeal of Louisiana, Fourth Circuit.
July 27, 2005.
Eddie J. Jordan, Jr., District Attorney, Yolanda J. King, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Pamela S. Moran, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge JAMES F. McKAY III, Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE).
TERRI F. LOVE, Judge.
On June 26, 2003, the defendant-appellant Tracy Albert ("Mr. Albert") was indicted on one count of aggravated rape of a victim under the age of twelve, a violation of La. R.S. 14:42. The defendant was arraigned and entered a not guilty plea on July 7, 2003. After a trial on the merits, the jury rendered a guilty verdict.
On September 8, 2004, the court sentenced the defendant to serve life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.[1] *575 It is from this judgment that Mr. Albert appeals, asserting that the life sentence is excessive and the trial court failed to comply with the requirements of La.C.Cr.P. art. 894.1.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
In April 2003 the victim, K.S.,[2] a ten year old, began vomiting two or three times a day almost every day. Mr. Albert, the defendant and the victim's stepfather, took her to Children's Hospital where she was diagnosed with a stomach virus. When her symptoms did not improve the following week, he took her to a pediatrician, who again diagnosed a stomach virus. When the symptoms reoccurred the following week, on April 24, 2003 the victim's mother, S.A., took her to University Hospital. Mr. Albert returned to work offshore on an oil rig and was not able to take K.S. for medical treatment as he had before. At the hospital, Dr. Thao Nguyen examined K.S., obtained a urine sample from the victim, and had the pregnancy test run in the emergency room. The pregnancy test yielded positive results. Dr. Nguyen conducted a full pelvic examination of K.S. and asked her if anyone had ever touched her in certain areas; K.S. said no. Nevertheless, a second round of tests confirmed that K.S. was pregnant. Dr. Nguyen advised S.A. of the results and also called the New Orleans Police Department and Child Protection Services.
Detective Darrell Smith of the New Orleans Police Department Child Abuse unit responded to Dr. Nguyen's call regarding K.S. At the hospital, he spoke with both K.S. and S.A. Based on those interviews, he applied for and obtained an arrest warrant for the defendant.
A few days later, S.A. decided that it would be best for K.S. that the pregnancy be terminated. She gave consent for the fetus to be turned over to the police. The abortion was performed on May 2, 2003, by Dr. Washington Bryan, an obstetrician. Dr. Bryan turned over the fetus to Detective Smith so that DNA testing could be performed. Dr. Bryan testified at trial that he determined from the date of the victim's last menstrual cycle[3] that the date of conception was March 12, 2003, plus or minus three days. He further testified that he saw no evidence of vaginal or genitalia trauma on the victim.
Detective Smith, after obtaining the fetus from Dr. Bryan, transported it to the Crime Lab. After receiving the appropriate search warrant, Detective Smith personally took a buccal swab, which consists of swabbing a Q-tip inside the mouth along the cheek, from the defendant. With S.A.'s consent, Detective Smith took a buccal swab from K.S. He turned both over to the Crime Lab for testing.
At trial Ann Montgomery ("Ms. Montgomery") testified that she is the DNA Technical Leader for the New Orleans Police Department DNA lab. As part of that job, she initially set up the DNA lab, trained personnel, and supervised DNA tests. The test in this case was done by Deborah Westley ("Ms. Westley"), who was no longer an employee of the N.O.P.D. at the time of trial. Ms. Westley's work had been supervised by Ms. Montgomery, who was recognized as an expert in the field of DNA testing. In Ms. Westley's *576 report, which Ms. Montgomery approved, Ms. Westley concluded that the comparison of DNA from K.S., the defendant, and the fetal tissue showed that the defendant could not be excluded as the biological father of the fetus. Ms. Montgomery testified that, statistically and barring that the defendant has an identical twin, the probability that the defendant was the father was 99.9 percent. She opined that there was a one in 143,000 chance that the defendant was the father. She explained that this ratio meant that one would have to test 143,000 African Americans "to find somebody else who could also be the male contributor to that fetal tissue."
S.A. testified at trial that, after Dr. Nguyen told her K.S. was pregnant, she talked to her daughter at the hospital. She asked her if anyone had touched her inappropriately and they also talked about keeping secrets. K.S. had a loud outburst, began crying, and said that the defendant, her stepfather, had touched her. K.S. told her mother that the contact started in November 2002 when the family lived on Behrman Avenue, then happened again when they moved in December 2002 to Tullis Drive.
S.A. further testified that she and the defendant had been married for seven years, and had been living together for a total of nine years, since K.S. was one year old. She admitted that the victim had regular visitation, including occasional overnight visits, with her biological father. S.A. stated that she worked from 5:00 a.m. to 2:00 p.m. at a hospital and that the defendant's work schedule required him to be offshore for four weeks at a time and home for two weeks. When he was working, S.A.'s mother or other family members would baby-sit the children while S.A. worked.
K.S. testified at trial that she was presently twelve years old and in the seventh grade. She testified that the first incident occurred in November 2002 when she was living on Behrman Avenue with the defendant, her stepfather; her mother; and A.A., her younger sister. One day she and her sister were watching television in their room when the defendant entered and told A.A. to leave. He then got in the bed with K.S., pulled down her pants, got behind her, and put "his private part" in her "private part." K.S. testified that the defendant moved around a little and that she could feel his private part. After the defendant left, K.S. went into the bathroom to take a bath and noticed that the area between her legs was wet.
A second incident occurred on December 6, 2002, the day the family moved into an apartment on Tullis Drive. On that evening, she and A.A. were sleeping on the floor because their beds were not there yet. The defendant again penetrated her from behind. K.S. described a third incident, which occurred in her mother's bedroom when K.S. was putting some clothes away. Also, K.S. stated that there was another time that the defendant attempted to molest her; she pushed him away and accidentally broke a lamp. K.S. testified that, after her mother told her she had been raped, she told her mother that the defendant was the person who did it. K.S. said she never told anyone before it was discovered that she was pregnant because she was afraid that the defendant would hurt her mother or her sister. She admitted that the defendant was away from home for three or four weeks at a time working. Also she stated that, when the defendant was away working and her mother was working, she and her sister would go to her cousin's house.
The State presented three witnesses, Ernest Carter of the district attorney's office, Kenneth Brown of the Criminal District Court's property room, and Anna *577 Duggar of the N.O.P.D. Crime Lab, to establish a chain of custody for the fetal tissue exhibit. The three witnesses accounted for the fact that the exhibit was repackaged because the original bag had begun leaking after it was moved to the clerk's office property room. They further explained that the exhibit was taken back and forth between N.O.P.D. and the clerk's office because the latter does not have the capability to refrigerate exhibits.
The sole witness for the defense was the defendant, Mr. Albert. He denied raping K.S. He explained his work schedule, three or four weeks on and two weeks off, and identified an employment history showing that schedule for the period of January 2003 through March 2003. According to that schedule, which had been prepared for him by his employer and was admitted into evidence without objection from the State, he was working offshore from March 7, 2003 to March 28, 2003. The defendant explained that a helicopter transported him to and from the oil rig where he was a cook's assistant.

ERRORS PATENT
A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR
In the sole assignment of error, the appellant argues that the life sentence, although statutorily mandated, is excessive and that the trial court failed to comply with the requirements of La.C.Cr.P. art. 894.1.
In State v. Gorby, XXXX-XXXX (La.App. 4 Cir. 2/11/04), 868 So.2d 193, this Court reiterated the standard for reviewing a sentence:
Article I, § 20 of the Louisiana Constitution of 1974 provides that "[n]o law shall subject any person ... to cruel, excessive or unusual punishment." A sentence, although within the statutory limits, is constitutionally excessive if it is "grossly out of proportion to the severity of the crime" or is "nothing more than the purposeless and needless imposition of pain and suffering." State v. Caston, 477 So.2d 868, 871 (La.App. 4 Cir.1985). However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. State v. Brady, 97-1095 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264.
Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Black, 98-0457, p. 8 (La.App. 4 Cir. 3/22/00), 757 So.2d 887, 892. If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case. State v. Caston, 477 So.2d at 871. The reviewing court must also keep in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Quebedeaux, 424 So.2d 1009, 1014 (La.1982).
The trial court has great discretion in sentencing within the statutory limits. State v. Trahan, 425 So.2d 1222 (La.1983). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D).
Gorby, pp. 3-4, 868 So.2d at 195-96. Furthermore, as noted in State v. Allen, p. 14, 2003-2156 (La.App. 4 Cir. 5/19/04), 876 So.2d 122, 131, writ denied XXXX-XXXX (La.1/19/04), 888 So.2d 194, when there is a mandatory minimum sentence such as life imprisonment for second degree murder:

*578 There is only one way that a defendant can rebut the presumption that a mandatory minimum sentence imposed by the legislature is constitutional. The defendant must show that "because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." State v. Lindsey, 99-3256, 99-3302, p. 5 (La.10/17/00), 770 So.2d 339, 343.
In the instant case, the appellant complains that the trial court "failed to explore" his background or history and instead assumed that it could not deviate from the mandatory sentence. He further complains that the trial court simply adopted the victim impact statement given by the victim's mother to justify the sentence, specifically giving as its reason "the emotional damage to the child."
A review of the sentencing transcript confirms that S.A. did give a lengthy statement regarding the impact of the crime on her daughter and her entire family. She testified that K.S. had been receiving counseling and had undergone an abortion at age ten. She read a statement into the record, stating that she had "loved and trusted" the defendant to be a husband and father to K.S. and A.A. and that he had betrayed them. S.A. recounted that her family, including her grandmother, parents, sisters, and cousins, had welcomed him into the family. One of her sisters included him in her wedding party. S.A. stated to the defendant that these family members "are just a few people whose lives that [sic] have been shattered by your actions. We feel angry, violated and betrayed for trusting you . . . You raped [K.S.] when she was ten years old and impregnated her. You stole her innocence, her life won't ever be the same." S.A. went on in her statement to describe the impact on the child, which she and the defendant had together:
What do we tell [A.A.] when she grows up, her father is a rapist, her father raped her sister? Yes, that's exactly what you did. She would want to know why her father is in prison, why he's not around. . . . This is going to be a challenging conversation for us. All of this is created by your actions and by your choices.
S.A. concluded her statement by explaining to the defendant that the guilty verdict was not going to erase the pain he had caused, and that "[n]o child will ever be safe as long as you are on the streets. And for the rest of your pathetic, pitiful life, I hope you live in everlasting misery."
Notably, the trial court did not simply rely on the statement of S.A. when it imposed sentence. Instead, the court stated:
Mr. Albert, do you recall that I, along with my staff and the other witnesses. . . sat and heard testimony from a procession of witnesses, but most notably the victim in this matter. . . . Your stepdaughter, it was heart-wrenching to listen to.
You violated the confidence and trust that she placed in you, that her mother placed in you. You took advantage of her situation and you didn't just do it once, it happened at least twice perhaps more. You have forever stigmatized that child and have changed her life unalterably, irrevocably. She can't take back the innocence and virginity that you stole from her at such a young, tender, impressionable age.
You've let her down. You've let her family down. . . . I can't say it in a more compelling way than [S.A.] just said it. . . .
*579 The appellant's assertion that the trial court imposed the mandatory sentence without giving any reasons is without merit. The court noted the horrible impact on the victim and her family, not the least of which was the impregnating of a ten-year old child to whom the defendant had been a father since she was one-year old. The defendant never advanced a single mitigating factor in this case, nor does there appear to be any except for his lack of a prior criminal record. However, as noted by S.A. and implicitly acknowledged by the trial court, the defendant poses a risk to other children if he were ever allowed out of prison.
Overall, the record fails to demonstrate that the defendant rebutted the presumption that the minimum sentence mandated by the legislature is not constitutionally excessive as applied to him. Similarly, in State v. Taylor, 36,066, pp. 15-16 (La.App. 2 Cir. 6/12/02), 821 So.2d 633, 642, the Second Circuit, after noting that the mandatory life sentence for aggravated rape has repeatedly been found constitutional by the Louisiana Supreme Court, found that the imposition of a life sentence upon the defendant who on a single occasion raped his six-year old niece did not shock the court's sense of justice.
This assignment of error lacks merit.

CONCLUSION
Based on the foregoing, we find that the trial court is without error and Mr. Albert's conviction and sentence is therefore, affirmed.
AFFIRMED.
NOTES
[1] The State apparently had chosen not to pursue the death penalty under La. R.S. 14:42(D)(2) as there is nothing in the record to indicate that the penalty phase was held.
[2] Initials are utilized in place of the name of victim and her family to protect the victim's identity.
[3] S.A. testified that her daughter began menstruating when she was eight years old.