986 So.2d 158 (2008)
STATE of Louisiana
v.
Vawn BORDEN.
No. 07-KA-396.
Court of Appeal of Louisiana, Fifth Circuit.
May 27, 2008.
*160 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Andrea F. Long, *161 Thomas S. Block, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Shane P. Landry, Attorney at Law, St. Francisville, LA, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, WALTER J. ROTHSCHILD, and FREDERICKA HOMBERG WICKER.
MARION F. EDWARDS, Judge.
Defendant/appellant, Vawn Borden ("Borden"), was charged with aggravated rape of a "known juvenile," a violation of LSA-R.S. 14:42, and indecent behavior with a "known juvenile," LSA-R.S. 14:81. The victims' mother, J.M., was charged in both counts as a co-defendant, but this appeal involves only Borden. Prior to trial, Borden filed two motions to quash the indictment with respect to the aggravated rape charge, along with a motion to suppress evidence. These motions were denied.
Borden filed a motion to sever the two offenses for trial, which the trial court granted. When the matter came for trial, the trial judge advised Borden of his constitutional right to a trial by jury. Borden waived his jury rights as to count two of the indictment, indecent behavior with a juvenile, and elected to be tried by the judge on that count. On September 19, 20, and 21, 2006, Borden was tried by a twelve-person jury as to count one, and by the judge as to count two. The judge found Borden guilty as charged as to count two, and then the jury returned a verdict of guilty as charged on count one.
Borden was sentenced to life imprisonment at hard labor on count one, without benefit of parole, probation, or suspension of sentence, and to seven years at hard labor on count two. The court ordered that the sentences be served consecutively. Borden appeals both his convictions and sentences. Matthew Vinet ("Mr. Vinet") testified at trial that, on-and-off from the time she was a baby, he and his wife, Keri Vinet ("Ms. Vinet"), cared for the victim, D.M., who was Ms. Vinet's minor niece. Ms. Vinet's sister, J.M., is the child's mother. D.M. was nine years old at the time of the offense. Mr. Vinet testified that, in October, 2002, D.M. was spending weekdays at his family's home in Westwego, but the child sometimes stayed with J.M. and Borden at their apartment in Kenner. On October 24, 2002, D.M. was crying when she arrived home from school. Mr. Vinet asked her what was wrong. As a result of what the child told Mr. and Ms. Vinet, they contacted the Westwego Police. They were eventually referred to the Kenner Police Department, and Mr. Vinet gave a statement to Detective Keith Forsythe ("Detective Forsythe").
Mr. Vinet testified that he also telephoned Borden, who was J.M.'s live-in boyfriend at the time, and confronted him regarding accusations made by D.M. In response to the telephone call, Borden went to the Vinet house. When Mr. Vinet asked him whether D.M.'s accusations were true, Borden said J.M. forced him, through blackmail, to lick D.M. between her legs.
Detective Forsythe testified that he was the lead detective on the aggravated rape investigation involving D.M. The officer learned D.M. was living with her aunt and uncle because her mother, J.M., was involved in legal troubles for which she expected to be imprisoned. He determined D.M. had lived with the Vinets for a matter of weeks at that point. J.M. was living with Borden and C.B., the couple's infant daughter. On October 25, 2002, Ms. Vinet brought D.M. to the police station to meet with Detective Forsythe. The officer testified that he conducted a brief interview with the child, and she disclosed the *162 crimes that had been perpetrated on her. Based on what D.M. told him, he focused on Borden and J.M. as suspects.
Detective Forsythe arranged an interview for D.M. with Omalee Gordon ("Ms. Gordon"), a forensic interviewer with the Child Advocacy Center ("CAC"), and also scheduled the child for a physical examination at Children's Hospital.
Detective Forsythe went to the CAC to observe Ms. Gordon's interview with D.M. The officer did not participate in the interview, but watched it on a closed circuit television monitor in a separate room. D.M. gave Ms. Gordon details about the sexual abuse to which she had been subjected. D.M. was examined in the emergency room at Children's Hospital in New Orleans on October 29, 2002. The emergency room report shows the child stated that Borden had rubbed and licked her "front private," (vagina) and that he had put his "ding-a-ling" (penis) by her "back private" (butt). D.M. further reported that her mother had placed Borden's hand on her (D.M.'s) "front private" after giving her a pill. On November 5, 2002, the child was interviewed and examined by Dr. Ellie Wetsman, a forensic pediatrician at the Child at Risk Evaluation Center at Children's Hospital.
Detective Forsythe stated that he met with Borden and his attorney at the Kenner Police complex on October 30, 2002. The officer advised defendant of his Miranda[1] rights. Borden waived his rights and submitted to a tape-recorded interview with Detective Forsythe and Detective Brian McGregor. The audio tape of the interview was played for the jury at trial. During the recorded interview, Borden explained that he was involved in a live-in relationship with J.M., and the two shared an apartment on West Esplanade Avenue in Kenner. D.M., J.M.'s daughter from a prior relationship, lived with the couple, as did the infant daughter Borden had fathered with J.M. Borden said D.M. began calling him "Daddy." According to Borden, his relationship with J.M. turned sour soon after the two began living together. When he told J.M. he intended to leave her, she threatened to have D.M. accuse him of molesting her. Borden told the officers J.M. took pills, including Soma, Xanax, and pain pills. Some of the pills were legally prescribed for her, and she obtained others by some other means. J.M. used the pills to excess, and they often caused her to sleep.
According to Borden, J.M. left pornographic videotapes where D.M. could access them. When asked whether he had seen D.M. watching those tapes, Borden said he had not. Borden stated that when he refused to give J.M. money to buy pills, J.M. had D.M. write in her diary that he had touched her (D.M.) in bad places, that he had put his mouth on her, and that he had put his penis in her butt. Borden said that, on the occasions when he gave J.M. money, she allowed him to tear those pages out of the diary.
According to Borden, on New Year's Eve of 2001, J.M. told him she had given D.M. a Xanax pill. After that, the child had difficulty walking. On the bed in the master bedroom of the apartment, J.M. took off D.M.'s clothing and told him she wanted him to f* *k the child once she lost consciousness. J.M. grabbed his hand and tried to place it on D.M.'s vagina. Borden said he refused to touch the child. He told the officer that, on one occasion, he took D.M. to the lakefront in Kenner and told her not to write accusations against him in her diary anymore because the entries would get him into trouble with police. On *163 January 14, 2001, his birthday, J.M. visited the Vinets with D.M. J.M. telephoned him from there and told him she had something for him. She said she had given D.M. half of a Xanax pill. Borden told J.M. he was not interested in what she was suggesting he do to D.M. When he arrived at the apartment, he saw that D.M. was behaving as if she were drunk. J.M. put the child on their bed. J.M. said she was going to give the child a whole Xanax pill in order to "`knock her out.'" She told Borden that once D.M. was knocked out, she wanted him to get some Vagisil ointment from the closet, put it on his penis, and have vaginal intercourse with the child. Borden said he warned D.M. not to swallow the pill, but she did so anyway.
Borden told the officers he was drinking alcohol on January 14, and he believed J.M. drugged his drink that night. He said he dozed off, and he awoke to find J.M. pulling his hand towards the child. J.M. told D.M. that she had found Borden putting his mouth on her (D.M.'s) vagina while she (D.M.) slept. Borden refused to touch the child, but J.M. continued urging him to do so. He said J.M. coached D.M. to make accusations of molestation against him. Borden stated that, in addition to the New Year's Eve and January 14 incidents, there were several more instances where J.M. tried to place his hand on D.M.'s vagina, although he could not recall the specific dates of those occurrences. J.M. also urged him to put his penis in D.M. Borden recounted an occasion when he fell asleep on the sofa at the apartment, and he awoke to find J.M. stroking his exposed penis and showing it to D.M. Borden stated that his hand never made contact with D.M., and he did not ever put his penis in her. He denied having any inappropriate contact with D.M.
He informed the officers that, after J.M. gave birth to their daughter, C.B., he was afraid to leave her alone with the baby, because J.M. was constantly either using drugs or was out stealing in order to buy more drugs. J.M. had D.M. assist her in committing the thefts. Further, J.M. also stole money and property from Borden to fund her drug habit, and she began withholding the baby from him in order to extort money from him. He accused J.M. of using money to buy items such as cigarettes for herself, while threatening to let the baby go unfed.
Borden declared that, when he went to the Vinet residence, he did not confirm or deny the accusations D.M. had made against him because D.M. was there, and he did not want to discuss the matter in front of her. Detective Forsythe testified that, after the interview, he obtained arrest warrants for Borden and J.M. He also obtained a search warrant for the couple's Kenner apartment. The detective participated in the search, looking for items Borden had mentioned in his statement.
Items seized in the search included, among other things, D.M.'s Barbie diary, several commercial videotapes depicting sexual activity, and a homemade videotape depicting Borden and J.M. engaged in various sex acts in the presence of their infant daughter, C.B. This latter tape formed the basis for count two of the indictment. Detective Forsythe also found empty prescription bottles for Lorcet, Soma, Xanax, and Vicodin in the apartment. All medications were prescribed for J.M.
Ms. Gordon testified she is employed by the Gretna Police Department as a forensic interviewer at the CAC. She explained the CAC is a neutral facility where children are brought for videotaped interviews after they have made allegations of abuse or witnessed a crime. Her job, as a forensic interviewer, is not to provide therapy but to simply collect facts. Ms. Gordon testified that she interviewed D.M. on October *164 29, 2002. She identified State's Exhibit 25 as the video recording of that interview. The trial court allowed the tape to be admitted in evidence over Borden's objection, and the recording was played for the jury.
The videotape shows D.M. telling Ms. Gordon that she lived in an apartment in Kenner with her mother, Borden (whom she referred to as her father), and her baby sister. D.M. said she was at the Vinet house when her mother gave her an orange pill for a headache. Her mother then took her to the Kenner apartment and gave her a white pill. D.M. said after that she was unable to walk properly, and Borden helped her to walk. D.M. reported that she was lying on her mother's bed between her mother and Borden, and the two adults talked about "fantasies" involving children. Her mother asked Borden if he liked children, and he responded, "[S]ort of." D.M. said she thought that was the wrong answer and that Borden should have said, "[N]o." Her mother then removed her (D.M.'s) nightgown and underwear. Her mother placed Borden's hand on her "private," and his hand moved up and down. He then licked her private. After that, Borden put his "ding-a-ling" by her "back private." D.M. said this occurred when she was nine years old and in the fourth grade.
D.M. stated that Borden did not do those things to her every night but that when he came home drunk, he would go into her bedroom and awaken her. He would touch her front private and move his hand up and down. He also tried to "tongue kiss" her, but she moved her head and his tongue touched the outside of her mouth. Sometimes she awoke to see Borden near her bed, and her mother would tell him to go back to bed.
D.M. said Borden also touched her in the living room of the apartment. In those instances he put his hand on her private and licked between her legs. He would pull her clothes down. She would tell him that she was his little girl, and that he should not do that. D.M. stated that the first person she told about the abuse was her cousin, Angel. She also told her mother, but her mother did not act on the information. D.M. said she knows her mother was aware of what Borden was doing to her, as she told her mother about it. J.M. did not notify the police. D.M. told Ms. Gordon she wrote in her Barbie diary about the things Borden did to her. Her mother took the diary away from her, and she heard Borden tell her mother he had taken pages out of the diary and thrown them in a dumpster. D.M. told her Aunt Keri and Uncle Matt about the abuse, and she thinks they reported it to police.
D.M. testified at trial. She stated she was now thirteen years old and lives with her biological father and her stepmother, Donna. D.M. testified that she reviewed the videotaped interview she did with Ms. Gordon, and her statements to Ms. Gordon were truthful. D.M. said she recalled waking up in the middle of the night to find her mother removing her underpants. Borden then put his head between her legs and licked her front private part. He did that on more than one occasion in her mother's bedroom, in her own bedroom, and in the living room. He also put his front private part by her butt.
She testified that she wrote in her diary about the things Borden did to her. She identified State's Exhibit 7 as her diary. D.M. said Borden tore several pages out of her diary, and drove her to the lakefront, telling her it would break up the family if she told anyone about what he did to her. D.M. testified that her mother did not prompt her to fabricate accusations against Borden, and her mother did not *165 make her write anything in her diary. She believes the things her mother did to her were wrong, and she is sad about them. She still thinks about them. D.M. said that she would not make these claims against Borden if they were not true, since that would be a lie.
Dr. Scott Benton and Dr. Ellie Wetsman also testified (infra).
Borden called three character witnesses at trial. Karen Angerdina testified that she is a friend of Borden's mother and has known Borden for thirty years. She is acquainted with people in the community who know him and she has never heard anyone attack his moral character or call him a liar. Neither has she ever heard anyone in the community accuse him of touching or abusing a child.
Lisa Shook testified that she has lived next door to Borden since 1975. She has not heard anything bad said about him among people who know him in the community, nor has she heard anyone in the community speak of him fooling with children. She trusts Borden with children.
Linda Newman ("Ms. Newman") testified that she has known Borden for twenty years and was a friend of his mother. She knows many people who know Borden and has never heard people in the community refer to him as a liar or a sexual predator. Ms. Newman testified that D.M. was a friend of her daughters, who are now sixteen and ten years of age. D.M. stayed overnight at Ms. Newman's house several times, and her older daughter used to stay overnight at Borden's home. She stated that she did not observe any inappropriate behavior between Borden and D.M.
Borden took the stand on his own behalf. He testified that, prior to his arrest, he was a zone manager at Northrup Grumman in Bridge City. He supervised shipfitters, welders, pipefitters, sandblasters, painters, and machinists. He stated that he had a conviction for possession of a controlled dangerous substance in 1974 or 1975, when he was twenty-four or twenty-five years old, and also had some misdemeanor convictions. He testified that, prior to the charges in this case, he was never accused of touching a child inappropriately and has often babysat the children of his girlfriends without incident.
He testified that he met J.M. in June 2001, and watched D.M. while J.M. worked nights as a bartender. Borden and J.M. eventually moved to the Kenner apartment where the alleged offenses occurred. At first he believed J.M. to be a nice woman, but he soon learned she took a lot of pills such as Xanax and pain medications. J.M. had legal prescriptions for the drugs, but she also obtained the pills illegally. Not long after they met, J.M. quit her job and demanded that Borden pay for her drugs.
Borden testified that, on New Year's Eve of 2001, J.M. told him she had given D.M. a Xanax pill. J.M. removed D.M.'s clothes, and she urged him to have sex with the child. He told J.M. he was not interested in having sex with children and when J.M. fell asleep, he awoke D.M. and told her to get dressed. He testified that he had to assist her because she kept losing her balance and falling over. Once D.M. was dressed, he put her on the living room sofa.
Borden stated that J.M. telephoned him from her sister's house on his birthday, January 14. J.M. was there to pick up D.M. J.M. told him she had given the child half of a Xanax pill and that she had a surprise for him. He told J.M. that if she had in mind the same thing she had tried with him on New Year's Eve, he was not interested. When J.M. brought D.M. home, the child looked drunk. J.M. told Borden she was going to give D.M. a *166 whole Xanax pill, and then he would want to have sex with the girl.
Borden testified that he saw J.M. give D.M. a whole Xanax pill, that J.M. drugged him, too, and that he passed out as a result. He awoke to find J.M. attempting to place his hand on D.M. J.M. told the child he had put his mouth on her (D.M.'s) "tee tee." He denied ever performing oral sex with D.M. or inserting his penis in the child's anus. Borden also said he did not tongue-kiss D.M. J.M. might have put her mouth on D.M., but in her drugged state the child could not discern who did it.
Borden testified that J.M. told D.M. what to put in her diary and that J.M. used the diary entries to threaten him. He removed pages from the diary that said he had anal sex with D.M. and that he had licked between the child's legs.
In his first assignment of error, Borden contends the evidence was insufficient to support a guilty verdict to the charge of indecent behavior with a juvenile, based merely upon the presence of an infant, C.B., in the same room while he and his concubine engaged in the videotaped sexual activity. To support a conviction for indecent behavior with juveniles under LSA-R.S. 14:81, the State must prove that (1) there was an age difference of greater than two years between the accused and the victim, who was not yet seventeen; (2) the accused committed a lewd or lascivious act upon the person or in the presence of a child; and (3) the accused intended to arouse or gratify either his own or the victim's sexual desires.[2] For purposes of LSA-R.S. 14:81, "`[a] lewd or lascivious act is one which tends to excite lust and to deprave the morals with respect to sexual relations and which is obscene, indecent, and related to sexual impurity or incontinence carried on in a wanton manner.'"[3]
Indecent behavior with a juvenile is a specific intent crime for which the State must prove the offender's intent to arouse or gratify his sexual desires by his actions involving a child.[4] Specific intent to commit indecent behavior with juveniles need not be proven as fact, but may be inferred from the circumstances and actions of the defendant.[5] Borden argues that the only evidence the State presented as proof as to count two was State's Exhibit 10, a VHS tape; and that the videotape does not show he had the specific intent necessary for a violation of LSA-R.S. 14:81.
On the videotape's label is handwritten "XXXR J.M. & V.B. 4-12-02." The videotape depicts an unclothed adult man and a partially clothed adult woman engaging in various sex acts with each other. Detective Forsythe, who viewed the tape, testified that Borden and J.M. are the couple depicted and that the location appeared to be the couple's bedroom. The couple's infant daughter, C.B., is in a baby stroller situated next to the bed. At the beginning of the tape, the child is out of view, but she can be heard cooing as her mother talks to *167 her. After the couple engages in sexual activity for several minutes, the baby begins to cry. J.M. stops performing oral sex on Borden and says she will get the baby a bottle. Borden lifts the baby out of the stroller and takes the child out of the camera's view. At that point the footage stops. When it resumes the infant is no longer in the picture. The couple continues their sexual activity.
At one point the infant begins to fuss, and Borden is seen leaning over to pick her up. Borden places the baby, who is clearly awake, on his chest as J.M. continues to perform oral sex on him. After a few minutes, Borden places the baby on the bed next to him. Although the baby is out of the frame at this point, it appears the child remains next to Borden on the bed. Borden appears to pat or touch the child as the couple continues their sexual activity.
In finding Borden guilty, the trial court found that if a lewd and lascivious act is committed within the presence of a child, assuming the proper age difference, and if the intention of the lewd and lascivious act is to arouse the gratification or sexual desires of either person, it is a violation of LSA-R.S. 14:81.
Well, we had lewd and lascivious acts being performed in the presence of a child for the gratification of one of the persons, and that one person is Mr. Borden, for performing a lewd and lascivious act for his own gratification, sexual gratification, and it was in the presence of a minor. It wasn't to the minor, but it was in the presence of a minor.
And that's what the legislature has deemed is an offense....
Borden erroneously argues that LSA-R.S. 14:81 requires a link between the act of sexual gratification and the child victim's presence during the act, and proof of such a link requires a subjective analysis of the alleged perpetrator's intention vis-à-vis the child.
In Interiano, the defendant was convicted of indecent behavior with juveniles after masturbating and watching pornography while his ten-month-old child played or slept on the floor nearby. No physical touching occurred in that case. The Louisiana Supreme Court noted that the contention that a nexus must exist between the presence of the child and the sexual act is contrary to the legislative intent behind the statute, because the child need not be a stimulus for the sexual display in order to be psychologically harmed from having such a display committed in his or her presence.[6] The supreme court determined that subpart A of the statute "encompasses not only the physical touching of the victim in an indecent manner, but also `indecent sexual displays in the presence of a child under the age of 17.'" The court stated that it is not necessarily the act in and of itself that has to be lewd and lascivious. It explained that the statute gives notice "that a person knowingly engaged in any overt sexual activity performed in the physical proximity of a child enters a zone of danger in which he runs the risk that a trier of fact may later find that activity criminal in nature."[7]
The supreme court held that, in the absence of a physical touching upon the person of the child, LSA-R.S. 14:81(A) requires the knowing commission of a sexual act such that the child sees or senses that a sexual act is taking place, even if the child is not able to articulate or even comprehend what the offender is doing, for a violation to occur.
*168 Jackson v. Virginia[8] requires us to find whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the elements of the crime beyond a reasonable doubt. Here, Borden clearly touched and held his infant daughter in the course of his sexual activity with his girlfriend. Under the Interiano analysis, the fact that Borden and J.M. engaged in sexual activity in the presence of their infant daughter so that the child was in a position to see or sense that sexual acts were taking place formed a sufficient basis to support the conviction. The fact that Borden picked up and held the child while he continued to engage in sexual activity compels the conclusion that he had the requisite intent to complete the offense. This assignment of error is without merit.
Borden next argues that the trial court erred, and the defendant was materially prejudiced, when his motion to quash the bill of indictment on constitutional grounds was denied. He maintains that the trial court erred in denying his motion to quash the indictment as to count one, the aggravated rape charge. Borden points out that there are other sex offense statutes which include oral sex in their definitions, and none of them carry a mandatory life sentence as does aggravated rape. He urges that the legislature acted arbitrarily and unnecessarily in adding oral sex to the definition of rape in 2001, shortly before the alleged commission of the instant offense.
Borden argues in his appellate brief that LSA-R.S. 14:41 and 14:42 are "ambiguous" in that they identify oral sexual intercourse as rape, whereas the general public views oral sex and rape as two separate and distinct acts. Nevertheless, he specifically states on appeal that he is not challenging LSA-R.S. 14:41 and R.S. 14:42 as unconstitutionally vague. Rather, his claim appears to be that the legislature overstepped its constitutional bounds when it added oral sexual intercourse to the definitions of rape and aggravated rape, when there were other, less punitive statutes which already prohibited the same behavior. Borden argues that this multitude of statutes prohibiting the same conduct allows the district attorney to treat similarly situated defendants differently.
In his written motion to quash, defendant made the following arguments:
Defendant is charged with aggravated rape which has historically nationally has [sic] always been defined as non-consensual sexual intercourse.
Defendant is not accused of sexual intercourse (penile penetration) but of oral sex with the accuser.
There are in Louisiana a sufficiency of codal articles defining the crime of which the defendant is accused of committing.
The legislature cannot define a crime upon a whin [sic] that is not synonymous with the accusation.
The indictment described should be, therefore, quashed as a matter of law.
The trial court heard arguments on the motion to quash. Defense counsel maintained that the term rape is commonly understood by the public to mean penile penetration of the vagina. He further argued that the legislature ignored other statutes that define crimes which include oral sexual offenses involving juveniles. Defense counsel continued:
Your Honor, please, that is way beyond the scope of the legislature, even though they can do it, but we're objecting to it as being unconstitutional, as being a crime that should not carry a penalty *169 such as the legislature has made it to be. And the reason that the penalty is so great is that they put that in the statute of 14:42, which is aggravated rape.
Traditionally, and I know the court, we've talked about tradition, but the definition is, "the sexual penetration without consent." There is no other state that has expanded it to that great degree. And the fact that we do have four or five separate statutes which would cover that act, or the alleged act, we are asking that the court declare this both unconstitutional, beyond the scope of the legislature and the penalties being as severe as they are.
At the conclusion of arguments, the trial court ruled that the legislature was within its constitutional right to enact the statute and denied the motion to quash.
The constitutionality of a statute cannot be raised for the first time on appeal. An attack upon the constitutionality of a statute must first be presented in the trial court.[9] A party contesting the constitutionality of a statute has a three-tier burden. The presentation must be made in the trial court, the unconstitutionality must be specially pleaded, and the grounds for the claim particularized.[10]
The motion to quash filed in the present proceedings does not meet the three-tier burden. The written motion contained no specific claim that the statute in question was unconstitutional, and Borden did not rely upon any particular constitutional provision that limits the power of the legislature to enact the controverted statute. Accordingly, the constitutionality of LSA-R.S. 14:41 and R.S. 14:42 is not properly before this Court.[11]
In his third assignment of error, Borden contends that he was materially prejudiced and denied a fair trial when the trial court allowed the CAC tape to be entered into evidence and presented to the jury pursuant to LSA-R.S. 15:440.1 et seq. despite the unconstitutionality of that statute. He complains that the videotape of Ms. Gordon's CAC interview with D.M. constituted testimonial hearsay and, as such, it was inadmissible under the United States Supreme Court's holding in Crawford v. Washington.[12] Borden argues the trial court's admission  over his objection of the tape under the provisions of LSA-R.S. 15:440.1 was a violation of his Sixth Amendment right of confrontation.
The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. The confrontation clause of the Louisiana Constitution expressly guarantees the accused the right "to confront and cross-examine the witnesses against him." La. Const, art. I, § 16. Confrontation rights mean more than the ability to confront witnesses physically. Their main purpose is to secure for the defendant the opportunity to cross-examine.[13] Cross-examination is the primary means by which to test the believability and truthfulness of testimony, *170 and it provides an opportunity to impeach or discredit witnesses.[14]
In Crawford, the United States Supreme Court discussed the Confrontation Clause and held that testimonial hearsay statements may be admitted as evidence at a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant.
The Louisiana Supreme Court recently addressed the issue Borden raises herein under similar facts in State v. Kennedy,[15] an appeal arising from an aggravated rape conviction and death sentence in the Twenty-Fourth Judicial District Court in Jefferson Parish. The victim in that case, who was eight years of age at the time of the offense, testified at trial. While the child was on the stand, the State played for the jury her videotaped interview with Ms. Gordon. The victim remained on the stand after the videotape was shown, and she underwent direct and cross-examination.
The defendant in Kennedy argued, as defendant argues here, that the tape recorded interview was testimonial hearsay under Crawford, and that its admission at trial was violative of his right of confrontation. The Kennedy court rejected the defendant's argument, finding no Confrontation Clause violation. Citing Crawford, the court reasoned that the Confrontation Clause places no constraints on the use of prior testimonial statements where the declarant is present at trial to defend and explain them. A testimonial videotaped statement is not, therefore, inadmissible if the declarant testifies and can be questioned regarding the statement.[16] The Kennedy court further held that LSA-R.S. 15:440.5, which sets forth the requirements for admissibility of a videotaped interview, is not facially unconstitutional "as it specifically requires as a condition of admissibility that `the protected person is available to testify.' LSA-R.S. 15:440.5(8)."
Since D.M., the "declarant" in the videotaped interview at issue, testified at trial following the admission of the tape, and was subject to cross-examination, the tape's admission was not a violation of the Confrontation Clause.
Borden next alleges that the trial court erred and that he was materially prejudiced when the videotape of Ms. Gordon's CAC interview with the then nine-year-old victim was admitted and presented to the jury contrary to the express provisions of LSA-R.S. 15:440.1 et seq. Borden asserts that the videotaped interview did not comply with the requirements set out in LSA-R.S. 15:440.4 and LSA-R.S. 15:440.5 for the recording and admission of such evidence, in that Ms. Gordon influenced the child's responses by asking leading questions. Counsel does not specify in brief what questions he claims were leading.
Both LSA-R.S. 15:440.4(A)(3) and LSA-R.S. 15:440.5(A)(4) prohibit questions leading the protected person to make a particular statement. The Louisiana Supreme Court has found that "the rule forbidding leading questions is not so rigid that it should not yield somewhat to the discretion of the trial judge in the examination of a very young or timid witness."[17]

*171 Leading questions are ordinarily prohibited when propounded to one's own witness unless such witness is unwilling or hostile. LSA-R.S. 15:277. However, it is well settled that an exception is usually made when questioning a young child. Furthermore, notwithstanding the general rule against leading questions, the matter is largely within the discretion of the trial court and in the absence of palpable abuse of that discretion resulting in prejudice to the accused, a finding of reversible error is not warranted.[18]
The Second Circuit recently addressed the admissibility of a videotaped interview under LSA-R.S. 15:440.4 and 15:440.5 where the defendant complained the interviewer asked the child sexual abuse victim some leading questions.[19] There the court found the trial court did not err in admitting the recording of the interview despite the interviewer's use of leading questions. The court reasoned that the leading questions were asked for clarification purposes or to get specific details, and the child's answers did not appear to have been suggested by the interviewer.
A review of the CAC interview in the present case does not show that Ms. Gordon in any way suggested to D.M. how she should answer the questions that were put to her. The interviewer's questions were only leading to the extent necessary to ensure that the young girl understood what was being asked. At times Ms. Gordon reviewed D.M.'s responses with her for clarification purposes. In instances where Ms. Gordon mischaracterized things D.M. had told her, the child freely corrected her. Both Ms. Gordon and D.M. were available for cross-examination. Based on the foregoing, we find the videotaped interview complied with the procedural requirements in LSA-R.S. 15:440.4 and R.S. 15:440.5 and the trial court did not err in allowing it to be admitted in evidence. This assignment of error is without merit.
In his fifth assignment of error, Borden asserts that the trial court erred when it admitted State's Exhibit 24, D.M.'s Children at Risk Evaluation ("CARE") Center records, when it failed to properly perform its "gatekeeper" function "per Daubert" with regard to the expert testimony of Dr. Ellie Wetsman ("Dr. Wetsman") and Dr. Scott Benton ("Dr. Benton"), and when it failed to declare a mistrial "when Dr. Benton hijacked the trial and improperly substituted his judgment for that of the jury."
Borden makes two primary arguments on appeal: that the trial court erred in admitting the medical records pertaining to D.M.'s physical examination at the CARE Center at Children's Hospital and that the trial court erred in allowing expert witnesses, Dr. Benton and Dr. Wetsman, to testify to matters beyond forensic pediatrics, their stated area of expertise.
Prior to trial, the State filed a Notice of Intent to Use Statements By Child Abuse Victim to the Treating Physician Under Louisiana Code of Evidence Article 803(4). By that document, the State gave notice that it intended to introduce at trial the victim's medical history as compiled by Dr. Wetsman, including statements made by the victim to the doctor during her rape examination.
At trial, the State introduced photocopies of D.M.'s CARE Center records during the trial testimony of Dr. Wetsman. The packet includes a CARE Center forensic medicine referral report dated October 29, 2002, an emergency room screening form *172 dated October 31, 2002, a written history completed by Dr. Wetsman based on her November 5, 2002 examination of D.M., and some Children's Hospital lab reports. Dr. Wetsman testified that the documents accurately reflected the records from Children's Hospital concerning the examinations of D.M. Defense counsel objected to the admission of the documents, arguing, "I don't know whether all of them are certified properly, et cetera, and I don't know if she's in the position to say they are." The trial court overruled counsel's objection and allowed the documents to be admitted.
Although Borden raises several issues on appeal regarding the admission of the medical records, the only issue he preserved for appeal at trial is the sufficiency of the certification of the medical reports. LSA-C.Cr.P. art. 841. That issue is not raised here and, therefore, we will not address those arguments. Further, with regard to his Daubert[20] argument, Borden waived his right to complain by failing to request a Daubert hearing in the trial court.[21] Moreover, there is no showing that there was a need for a Daubert hearing regarding the doctors' expert testimony in the field of forensic pediatrics. The Louisiana courts have long accepted expert testimony in the field of forensic pediatrics and child abuse.[22]
Borden also complains that the doctors testified to matters beyond the scope of their expertise. Specifically, he argues that the doctors (and especially Dr. Benton) gave opinions that went to the ultimate issue of the case, violating the dictates of LSA-C.E. art. 704. He further complains that Dr. Benton's testimony helped to improperly bolster the credibility of Dr. Wetsman and the victim. Borden did not preserve this issue by making a timely objection below and is not, therefore, entitled to appellate review of this argument. LSA-C.Cr.P. art. 841. However, even if Borden had preserved the claim for review, we find it to be without merit. At trial, the court found Dr. Wetsman to be an expert in forensic pediatrics over Borden's objection. The parties agreed to a stipulation as to Dr. Benton's expertise, and the trial court accepted him as an expert in pediatric forensic medicine with subspecialties of delayed reporting of child sexual abuse and child sexual assault.
Under LSA-C.E. art. 702, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. The trial judge is vested with broad discretion in determining on the scope of expert testimony.[23]
While LSA-C.E. art. 704 bars an expert witness from expressing an opinion as to the guilt or innocence of the accused, the article also states that "[t]estimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact." Dr. Wetsman's *173 testimony pertained to her examination of the victim, an area clearly within her established expertise. Dr. Benton's testimony had to do with testing for child sexual abuse in general and the factors involved in delayed reporting of child sexual abuse. The prosecutor asked the doctor to give his professional opinion regarding some adult terminology D.M. used in reporting her abuse, and about how the facts surrounding D.M.'s reporting followed some of the general patterns of delayed reporting. Dr. Benton also testified about ways in which D.M.'s report fit the general patterns of child sexual abuse. Dr. Benton discussed Dr. Wetsman's medical qualifications, which comments were pertinent to this case since he trained her in the field of forensic pediatrics and supervised her examination of the victim. He also reviewed the CAC videotape and the police report. Dr. Benton did not give testimony outside the areas of his stated expertise, and he did not give an opinion on the ultimate issue of Borden's guilt or innocence. The doctors' testimony was admissible under LSA-C.E. art. 704. This assignment of error is without merit.
In his sixth assignment of error, Borden complains that his life sentence at hard labor without benefit of parole for aggravated rape is unconstitutionally excessive and constitutes cruel and unusual punishment "for what amounts to an oral sexual battery."
Borden argues, as he did in Assignment of Error Number Two, that the maximum penalties for the act of oral sexual intercourse under other sex offense statutes are far less than the sentence he received. He notes that the maximum sentence for sexual battery (LSA-R.S. 14:43.1) or oral sexual battery (LSA-R.S. 14:43.3) is ten years with or without hard labor and that the maximum sentence for aggravated crime against nature (LSA-R.S. 14:89.1) is fifteen years at hard labor. Aggravated incest (LSA-R.S. 14:89.1), Borden argues, carries a maximum sentence of twenty years. In comparison to those penalties, Borden argues, his life sentence constitutes the purposeless and needless infliction of pain and suffering.
LSA-C.Cr.P. art. 881.1 precludes the State or defendant from raising on appeal any objection to the sentence not previously raised in a motion to reconsider. Because Borden failed to move for reconsideration, we are limited to reviewing his sentence for constitutional excessiveness.[24]
A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or imposes needless and purposeless pain and suffering.[25] "`A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.'"[26] In this instance, Borden received the minimum sentence required by law for an aggravated rape conviction. It is presumed that a mandatory minimum sentence is constitutional.[27] A court may only depart from the mandatory sentence if it finds clear and convincing evidence in the particular case before it that would rebut the presumption of constitutionality.[28] In order to rebut the presumption of *174 constitutionality, the defendant must clearly and convincingly show that he is exceptional, that is, because of unusual circumstances he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. The Louisiana Supreme Court has cautioned that a downward departure from a mandatory minimum sentence should only be made in rare cases.[29]
In the present case, Borden offered no evidence at sentencing to rebut the presumption of constitutionality. In fact, no evidence was presented at the time of sentencing and no argument was made regarding a downward departure from the required sentence. Thus, Borden failed to carry his burden to rebut the presumption of constitutionality of his mandatory life sentence.
Further, the legislature is presumed to have enacted each statute with deliberation and with full knowledge of all existing laws on the same subject.[30] It is a well established principle that the determination and definition of acts which are punishable as crimes is purely a legislative function.[31] It is the legislature's prerogative to determine the length of the sentence imposed for crimes classified as felonies.[32] The penalties provided by the legislature reflect the degree to which the criminal conduct affronts society.[33] Courts are charged with applying these punishments unless they are found to be unconstitutional. The mandatory life sentence for aggravated rape is a valid exercise of the State legislature's prerogative to determine the length of sentence for crimes classified as felonies,[34] and has repeatedly been found to be constitutional.[35] Borden's argument, that the conduct for which he was charged with aggravated rape is also punishable under less punitive statutes, is not sufficient to show that his life sentence is unconstitutional. This assignment of error is without merit.
Our error patent review reveals that Borden was not notified of Louisiana's sex offender registration requirements in accordance with LSA-R.S. 15:541 et seq. The legislature recently enacted extensive amendments to the sex offender registration statutes, and those amendments became effective on January 1, 2008. Section 6 of 2007 La. Acts 460, the act by which the revisions were enacted, provides, in part:
The provisions of this Act shall apply to all persons convicted of a sex offense or a criminal offense against a victim who is a minor, as defined in R.S. 15:541, regardless of the date of conviction, with the exception of those persons required to register under previous provisions of law whose obligations to register] have been fulfilled and extinguished by operation of law.
*175 Although Borden's sentences were imposed prior to the effective date of the revisions, the new provisions must be applied to his case.[36]
Both of the offenses (aggravated rape and indecent behavior with a juvenile) for which Borden was convicted are designated as sex offenses by LSA-R.S. 15:541(14.1). LSA-R.S. 15:542 outlines mandatory registration requirements for those categorized as sex offenders under LSA-R.S. 15:541(14.1) and child predators. Additionally, LSA-R.S. 15:542.1 sets out notification requirements for those offenders categorized as sex offenders and child predators. Borden fits the definition of "child predator" under LSA-R.S. 15:541(3). LSA-R.S. 15:543(A) requires the trial court to provide written notice to all sex offenders and child predators of the aforementioned registration and notification requirements. Therefore, we remand the matter to the trial court with an order that Borden be informed in writing of both his sex offender registration requirements and his notification requirements.[37]
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
WICKER, J., concurs.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] State v. McClain, 04-98, p. 7 (La.App. 5 Cir. 6/29/04), 877 So.2d 1135, 1140, writ denied, 04-1929 (La. 12/10/04), 888 So.2d 835.
[3] State v. Lande, 06-24 (La.App. 5 Cir. 6/28/06), 934 So.2d 280, writ denied, 06-1894 (La.4/20/07), 954 So.2d 154 (quoting State v. Stec, 99-633 (La.App. 5 Cir. 11/30/99), 749 So.2d 784). See also, State v. Interiano, 03-1760 (La.2/13/04), 868 So.2d 9.
[4] State v. Wallace, 41,720 (La.App. 2 Cir. 1/24/07), 949 So.2d 556.
[5] State v. Battaglia, 03-692 (La.App. 5 Cir. 11/25/03), 861 So.2d 704, writ denied, 04-1701 (La.4/29/05), 901 So.2d 1058.
[6] State v. Interiano, supra.
[7] Id.
[8] 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
[9] State v. Mickel 07-47 (La.App. 5 Cir. 5/29/07), 961 So.2d 516 (citing Williams v. State, Dep't of Health and Hosp., 95-0713 (La. 1/26/96), 671 So.2d 899, 901).
[10] Id.
[11] See, State v. Mickel, 07-47 (La.App. 5 Cir. 5/29/07), 961 So.2d 516.
[12] 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
[13] State v. Lewis, 05-170, pp. 12-13 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 592, writ denied, 06-0757 (La. 12/15/06), 944 So.2d 1277.
[14] Id.
[15] 05-1981 (La.5/22/07), 957 So.2d 757, cert. granted, ___ U.S. ___, 128 S.Ct. 829, 169 L.Ed.2d 625 (2008).
[16] Id.
[17] State v. Carthan, 377 So.2d 308, 314 (La. 1979) (quoting State v. Williams, 143 La. 424, 78 So. 662 (1918)).
[18] State v. Feazell, 486 So.2d 327 (La.App. 3 Cir. 1986), writ denied, 491 So.2d 20 (La. 1986) (citations omitted).
[19] State v. Roberts, 42,417 (La.App. 2 Cir. 9/19/07), 966 So.2d 111.
[20] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[21] See, State v. Clark, 05-652, p. 14 (La.App. 5 Cir. 2/14/06), 924 So.2d 282, 290, writs denied, 06-0622 (La. 10/13/06), 939 So.2d 372, and 06-1175 (La. 1/12/07), 948 So.2d 138.
[22] See, State v. Greene, 06-667, p. 18 (La.App. 5 Cir. 1/30/07), 951 So.2d 1226, 1238, writ denied, 07-0546 (La. 10/26/07), 966 So.2d 571 (and cases cited therein).
[23] See, State v. Kennedy, XXXX-XXXX (La.5/22/07), 957 So.2d 757.
[24] State v. Lemon, 06-721 (La.App. 5 Cir. 1/30/07), 951 So.2d 1177.
[25] State v. Lobato, 603 So.2d 739 (La. 1992).
[26] State v. Smith, 99-0606 (La.7/6/00), 766 So.2d 501 (quoting State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973).
[27] State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672.
[28] Id.
[29] Id.; State v. Lindsey, 99-3256 (La. 10/17/00), 770 So.2d 339.
[30] State v. Brisco, XXXX-XXXX (La.7/6/06), 933 So.2d 754 (La.2006).
[31] Id.
[32] Id.
[33] State v. Smith, 99-0606 (La.7/6/00), 766 So.2d 501.
[34] State v. Prestridge, 399 So.2d 564, 582 (La. 1981); State v. Farria, 412 So.2d 577, 579 (La. 1982); State v. Talbert, 416 So.2d 97, 102 (La. 1982).
[35] See, State v. Foley, 456 So.2d 979 (La. 1984); State v. Albert, 2004-2098 (La.App. 4 Cir. 7/27/05), 914 So.2d 574; State v. Wilson, 28,403 (La.App. 2 Cir. 8/21/96), 679 So.2d 963.
[36] Accord, State ex rel. Olivieri v. State, 00-0172 (La.2/21/01), 779 So.2d 735, 736-37, cert, denied, 533 U.S. 936, 121 S.Ct. 2566, 150 L.Ed.2d 730 (2001), and 534 U.S. 892, 122 S.Ct. 208, 151 L.Ed.2d 148 (2001).
[37] See, State v. Vincent, 07-239, p. 7 (La.App. 5 Cir. 12/27/07), 978 So.2d 967.