STATE OF LOUISIANA
v.
BORIS J. STOGNER
No. 2009 KA 0172.
Court of Appeals of Louisiana, First Circuit.
June 19, 2009.
Not Designated for Publication
WALTER P. REED, District Attorney, and KATHRYN LANDRY, Special Appeals Counsel, Attorneys for State of Louisiana.
MARGARET S. SOLLARS, Louisiana Appellant Project, Attorney for Defendant-Appellant Boris J. Stogner.
Before: PARRO, McCLENDON, and WELCH, JJ.
PARRO, J.
The defendant, Boris J. Stogner, was charged by grand jury indictment with two counts of aggravated rape,[1] a violation of LSA-R.S. 14:42. The defendant pled not guilty. Following a jury trial, the defendant was found guilty as charged on both counts. The defendant filed a motion for post-verdict judgment of acquittal, which was denied. For each count, the defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence, with the sentences to run concurrently. The defendant now appeals, designating three assignments of error. We affirm the convictions, amend the sentences, and affirm as amended.

FACTS
On September 28, 2005, Margaret Ryals, a child protection investigator with the Office of Community Services, received a phone call from Sister Debbie Thomas, the principal of Faith Tabernacle Academy. Based on what Sister Debbie told her, Ryals went to the home of Mary Stogner and her husband, the defendant, on Otis Bickham Road in Franklinton, Washington Parish. The defendant was not home because he had been checked into drug rehab. Ryals spoke with Mary's daughters (the defendant's stepdaughters), eleven-year-old E.D. (hereinafter "E.D.I") and her younger sister, six-year-old E.D. (hereinafter "E.D.2"). E.D.I and E.D.2 disclosed to Ryals they were molested or raped by several people. E.D.I named the defendant, "Pee Wee," a family friend, Larry Duncan ("Uncle Larry"), who lived nearby, and Terry (Larry's girlfriend) as the offenders. E.D.2 named two of her brothers as the offenders. Also living in the house were Ruben Stogner ("Paw Paw") and three brothers of E.D.I and E.D.2. The Stogners and Duncans are cousins. Ryals had all of the children removed from the home. E.D.I and E.D.2 were placed in foster care.
Ryals contacted Detective Rochelle Hartmann, a juvenile investigator with the Washington Parish sheriff's office. Detective Hartmann scheduled interviews at the Children's Advocacy Center (CAC) in Covington. E.D.I was brought to CAC, where she was interviewed by Jo Beth Rickels, a forensic interviewer. A few weeks later, E.D.2 was brought to CAC, where she was interviewed by Bethany Case, a forensic interviewer. Shortly thereafter, Lisa Tadlock, a licensed clinical social worker, began counseling E.D.I and E.D.2. After the girls made further disclosures of sexual abuse by the defendant, Tadlock contacted Detective Hartmann. Detective Hartmann scheduled second CAC interviews for E.D.I and E.D.2. In her second interview, E.D.I was again interviewed by Rickels. In her second interview, E.D.2 was again interviewed by Case. Viewed in the entirety, the CAC interviews and the trial testimony of E.D.I, E.D.2, and Tadlock indicated the defendant vaginally, anally, and orally raped E.D.I, and vaginally raped E.D.2.
In February 2006, the defendant agreed to give a recorded statement to Detective Hartmann. In his statement, the defendant neither confirmed nor denied that he sexually abused his stepdaughters, but rather maintained he could not remember if such allegations of abuse were true because he was addicted to pain medication. The defendant testified at trial. He denied sexually abusing E.D.I and E.D.2. He felt E.D.I and E.D.2 were coached into making allegations of sexual abuse against him.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant argues the trial court erred in allowing the juvenile witnesses to testify by closed-circuit television. Specifically, the defendant contends that, pursuant to LSA-R.S. 15:283, there was no specific finding that face-to-face testimony would be injurious to the children.
Louisiana Revised Statute 15:283 provides, in pertinent part:
A. On its own motion or on the motion of the attorney for any party, a court may order that the testimony of a protected person who may have been a witness to or victim of a crime be taken in a room other than the courtroom and be simultaneously televised by closed circuit television to the court and jury, when the court makes a specific finding of necessity based upon both of the following:
(1) Expert testimony that the protected person would be likely to suffer serious emotional distress if forced to give testimony in open court.
(2) Expert testimony that, without such simultaneous televised testimony, the protected person cannot reasonably communicate his testimony to the court or jury.[2]
The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. This right provides two types of protections for a criminal defendant: the right physically to face those who testify against him and the right to conduct cross-examination. Coy v. Iowa, 487 U.S. 1012, 1017, 108 S.Ct. 2798, 2801, 101 LEd.2d 857 (1988). Public policy considerations and necessities, however, may take precedence over "face-to-face" confrontation. Maryland v. Craig, 497 U.S. 836, 849, 110 S.Ct. 3157, 3165, 111 L.Ed.2d 666 (1990).
The Craig court addressed whether the Confrontation Clause of the Sixth Amendment categorically prohibits a child witness in a child abuse case from testifying against a defendant at trial, outside of the defendant's physical presence, by one-way closed-circuit television. Craig, 497 U.S. at 840. The state sought to invoke a Maryland statutory procedure, similar to LSA-R.S. 15:283, permitting a judge to receive, by one-way closed-circuit television, the testimony of a child who is alleged to be a victim of child abuse. To invoke the procedure, the trial judge must first "determin[e] that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." Md. Cts. & Jud. Proc. Code Ann. § 9-102(a)(l)(ii)(1989). Craig, 497 U.S. at 840-41.
The Craig court held:
[I]f the State makes an adequate showing of necessity, the [S]tate interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.
Craig, 497 U.S. at 855. The Craig court elaborated on the requisite finding of necessity, which must be a case-specific one:
The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify. The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. . . . Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, i.e., more than "mere nervousness or excitement or some reluctance to testify."
Craig, 497 U.S. at 855-56 (citations omitted).
On July 8, 2008, the state filed a motion for the closed-circuit broadcast of the testimony of the victims under LSA-R.S. 15:283. The state contended the children would likely suffer serious emotional distress if forced to give testimony in open court and that, without the requested accommodation, the children could not reasonably communicate their testimony to the jury.
At the hearing on the motion, Lisa Tadlock, a licensed clinical social worker, testified for the state. She was accepted as an expert in the field of social work with a particular expertise in dealing with sexually abused children. In his brief, the defendant asserts there was no specific showing that the presence of the girls in the courtroom would have caused them serious emotional distress. He further contends, "All [Tadlock] could say was that the girls did not want to testify in an open courtroom, and facing [him] would hamper them in telling their stories to the jury." According to the defendant, the factors Tadlock gave in support of her opinions were "all general in nature" and that none of these generalities were sufficient to support the trial court's finding that the girls would be able to testify out of his presence. However, our review of the record indicates Tadlock's testimony adequately supported the trial court's specific finding of necessity for the girls to testify outside the presence of the defendant.
On direct examination at the hearing, Tadlock testified that, after several months of therapy with her, both girls made disclosures of sexual abuse regarding the defendant. They also expressed to Tadlock that they were afraid of the defendant and that they feared being in his presence. When asked by the prosecutor if she had an opinion as to whether the girls would likely suffer serious emotional distress if they were forced to give testimony in the presence of the defendant, Tadlock responded, "Yes, ma'am, I believe that it would be very emotionally detrimental to both girls." Tadlock explained that her opinion was based on her work with the girls in the past and their fear of the defendant, as well as her conversation with the girls that morning. Tadlock further testified that E.D.I would not be able to talk if she had to come into open court, and that E.D.2 would be "very scared" if she had to come into the courtroom. When asked by the prosecutor if she thought forcing the girls to testify in front of the defendant would cause them psychological or emotional distress, Tadlock responded in the affirmative.
On cross-examination, Tadlock testified the girls talked about being afraid of the defendant and not wanting to see him. When asked by defense counsel when the girls developed this fear of the defendant, Tadlock replied, "They were always afraid of Boris when they talked about it in therapy. They did not want to see him." Subsequently, the following colloquy between defense counsel and Tadlock took place:
Q. Now the emotional distress that these children would allegedly suffer if they were to testify in open court, is that fear more of Boris Stogner or of telling their story to the jury?
A. It's of having to face Mr. Stogner.
Q. They didn't tell you that they were afraid they might be nervous talking about this in front of 12 people?
A. I think it's a given that they would be nervous about that.
Q. But somehow that's not enough, but yet with Boris thrown in, then suddenly we're in the realm of severe emotional distress?
A. I think that it would bring up the trauma issues from the past, yes, sir.
Q. In a 14-year-old girl?
A. Yes, sir.
Q. This 14-year-old girl, who I noted on tape to be extremely vocal to the point of, I think we'd call it in the colloquial diarrhea of the mouth, would not be able to reasonably communicate to a jury in this matter?
* * *
A. Yes, sir, she just expressed to me that she would not be able to communicate the sexual abuse in open court.
Q. Why?
A. Because she's afraid of seeing Mr. Stogner.
Q. To the point of she'd be dumbstruck if she were brought out here and saw this man who she'd been living with for years?
A. That she would not be able to talk about the sexual abuse.
Q. Well, I don't know that's what the statute says. So she would be able to reasonably communicate about things other than the sexual abuse?
A. If Mr. Stogner were in the room, I think that it would still create anxiety and create emotional distress for her if she had to talk about anything and face Mr. Stogner.
On redirect examination, Tadlock testified the girls were currently in counseling in the state where they had been relocated. The prosecutor then asked, "And do you know if their counselor has expressed a concern that these children would not be able to communicate or testify, and it would cause emotional distress if they're forced to testify in front of the defendant?" Tadlock replied, "Yes, ma'am, that's true."
Following redirect examination, the trial court, after noting that Tadlock indicated E.D.I would be unable to reasonably communicate her testimony in court, asked her if it was likewise her opinion that E.D.2 would be unable to reasonably communicate her testimony in the presence of the defendant. Tadlock responded in the affirmative.
In ruling on the issue, the trial court stated, in pertinent part:
It's strictly a legal issue. The Court finds that the elements of the statute have been met as to both alleged victims, [E.D.I and E.D.2]. The Court, accepting the testimony of Ms. Tadlock that both severe emotional distress would be caused both children, and that both children are unable to reasonably communicate their testimony to the Court or jury in the absence of the measures which are being proposed; that being the utilization of a closed-circuit television, for lack of a better term. . . . The Court would, in order to ensure that Mr. Stogner's right to confrontation and right to assistance of counsel is most effectively dealt with, I'll allow one of the trial counsel to be present in the courtroom with Mr. Stogner, while one counsel is present with the witnesses.
Tadlock counseled E.D.I and E.D.2 for over ten months, and made it clear in her expert testimony that E.D.I and E.D. 2, if forced to give testimony in open court before the defendant, would likely suffer serious emotional distress and would be unable to reasonably communicate their testimony to the jury. Tadlock's testimony indicated, in particular, that the distress of E.D.I and E.D.2 was more than de minimis and would be caused by the presence of the defendant, rather than from general courtroom drama. See Craig, 497 U.S. at 856. We find no reason to disturb the trial court's ruling that the elements of LSA-R.S. 15:283 had been met as to both E.D.I and E.D.2. Accordingly, the trial court did not err in allowing E.D.I and E.D.2 to testify outside the presence of the defendant.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant argues the trial court erred in allowing Dr. Adrienne Atzemis to testify as an expert in pediatric medicine with a sub-specialty in forensic pediatrics.[3] Specifically, the defendant contends the trial court failed to apply the Daubert standard before allowing Dr. Atzemis to testify as an expert in the field of forensic pediatrics, which is not a recognized sub-specialty of pediatric medicine.
The standard of admissibility for determining the reliability of expert scientific evidence is set out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The defendant waived his right to complain by failing to request a Daubert hearing in the trial court. See State v. Borden, 07-396 (La. App. 5th Cir. 5/27/08), 986 So.2d 158, 172, writ denied, 08-1528 (La. 3/4/09), 3 So.3d 470. This failure to request such a hearing was noted by the trial court after defense counsel argued there was "no such critter" as forensic pediatrics:
This is neither the time or the place. It's been well known that this expert was going [to] be called for some period of time. There's been no Daubert hearing filed. I am going to allow full cross-examination relative to qualifications.
Accordingly, this issue was not preserved at trial and is not properly before this court. See LSA-C.E. art. 103(A)(1); LSA-C.Cr.P. art. 841.
Moreover, there is no showing that there was a need for a Daubert hearing regarding the doctor's expert testimony in the field of forensic pediatrics. The Louisiana courts have long accepted expert testimony in the field of forensic pediatrics and child abuse. Borden, 986 So.2d at 172.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, the defendant argues the evidence was insufficient to support the convictions. Specifically, the defendant contends that the CAC statements and trial testimony of E.D.I and E.D.2, as well as the lack of physical evidence, failed to establish the elements of aggravated rape. The defendant further contends that, while E.D.I and E.D.2 may have been sexually abused by other family members, E.D.I and E.D.2 did not identify the defendant as having molested them until after nine months of counseling, which suggests the girls were coached into identifying the defendant.
A conviction based on insufficient evidence cannot stand as it violates due process. See U.S. Const, amend. XIV; LSA-Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 LEd.2d 560 (1979); see also LSA-CCr.P. art. 821(B); State v. Ordodi, 06-0207 (La. 11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988). The Jackson standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that, in order to convict, the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno, 01-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.
Louisiana Revised Statute 14:42 provides, in pertinent part:
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
* * *
(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.
Louisiana Revised Statute 14:41 provides, in pertinent part:
A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
Aggravated rape is a general intent crime. State v. McDaniel, 515 So.2d 572, 575 (La. App. 1st Cir. 1987), writ denied, 533 So.2d 10 (La. 1988). General criminal intent is present whenever there is also specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. LSA-R.S. 14:10(2). The trier of fact is to determine the requisite intent in a criminal case. State v. Crawford, 619 So.2d 828, 831 (La. App. 1st Cir.), writ denied, 625 So.2d 1032 (La. 1993).
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. State v. Taylor, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932.
The testimony elicited at trial established that, shortly after making allegations of sexual abuse by the defendant to Sister Debbie and Margaret Ryals, E.D.I and E.D.2 gave individual interviews at CAC. In these first interviews, the girls provided sparing detail regarding the defendant's sexual abuse of them. For example, E.D.I stated that other family members, not including the defendant, touched her inappropriately. In her interview, E.D.2 stated she told Sister Debbie that she saw the defendant and E.D.I touch each other. The defendant pulled their pants down and "they got on top of each other." After being shown anatomically-correct male and female dolls, E.D.2 stated the defendant got on top of E.D.I and stuck his "thing" in her. She further stated that something like that never happened to her (E.D.2).
Shortly after E.D.2's CAC interview, Tadlock began counseling both E.D.I and E.D.2. E.D.I and E.D.2 underwent twenty-seven sessions of therapy from October 24, 2005, to September 7, 2006. Tadlock testified at trial that during their initial evaluations, both girls talked about sexual abuse by the defendant. They both talked about being taken out of their mother's home because the defendant had "put his thing in them." A period of time followed where the girls did not talk about the abuse. After some time, Tadlock was able to build a rapport with the girls, and they began to disclose more. E.D.2 told Tadlock that Paw Paw Ruben, Big Larry, Little Larry, and the defendant "all did it to her." After eighteen sessions of therapy, Tadlock contacted Detective Hartmann and told her the girls had recently made detailed statements about the sexual abuse. Detective Hartmann visited Tadlock's office and spoke with Tadlock. Tadlock told Detective Hartmann that E.D.I told her (Tadlock) the defendant took her in the room, pushed her on the bed, and held her arms behind her head. The defendant tried to penetrate her vaginally and anally. E.D.I also performed oral sex on the defendant. Detective Hartmann sat in on the therapy session and, based on what she heard E.D.I and E.D.2 tell Tadlock, she scheduled E.D.I and E.D.2 for a second CAC interview.
In her second CAC interview, E.D.I stated the defendant touched her chest and vagina. She stated that other family members also inappropriately touched her. On one occasion, the defendant tried to stick his penis in her "butt." She indicated with her forefinger and thumb almost touching that he "came that close." She further stated, with this same fingers gesture, that one time he got that close "sticking it all the way in." Finally, she indicated the defendant made her touch his penis with her mouth. E.D.I did not state the word "mouth." Instead, she pointed to her mouth. She also pointed to the mouth on a drawing of a girl.
In her second CAC interview, E.D.2 stated the defendant touched her in the wrong spots in the bedroom. The defendant also did this to E.D.I. E.D.2 indicated that, while her clothes were off, the defendant touched her vagina with his penis. When asked if he touched her on the inside or outside with his penis, E.D.2 stated "inside." E.D.2 was shown anatomically-correct clothed male and female dolls. E.D.2 was told to consider the male doll to be the defendant and the female doll to be her (E.D.2) and to demonstrate what happened. E.D.2 took all of the clothes off of the dolls, including the underwear. She stated the defendant had on a "dirty movie." She put the girl doll on its back. She put the boy doll on top of the girl doll and moved it several times back and forth. She indicated the boy doll's penis was inside the girl doll's vagina. When she was asked what part of her body hurt, E.D.2 pointed to the doll's vagina. E.D.2 also indicated she saw the defendant on top of E.D.I in her mother's bedroom.[4]
At trial, E.D.I testified on direct examination the defendant did "bad touching" to her. When the prosecutor asked her if the defendant touched her with his "private part," E.D.I responded, "I think so." Regarding how the bad touching started when E.D.I was with the defendant in her mother's bedroom, the following colloquy between the prosecutor and E.D.I took place:
Q. How would he touch you?
A. Well he would try to get me to take off my clothes, and, you know, he would just like start feeling on 
Q. What part of his body did he use when he was feeling you?
A. Sometimes his hands.
Q. Did he ever use any other part of his body?
A. I think once.
Q. What part of his body did he use once?
A. Goodness. His private part, I think.
Q. What part of your body did he touch with his private part?
A. It depends on which time.
Q. Tell me what parts of your body, altogether, did he touch?
A. My butt and one time here in the private part 
Q. When you say here, can you tell us with words what part that is?
A. My private part.
Q. When he touched your butt with his private part, was his private part on the outside or inside, if you could tell?
A. I don't really remember that part.
Q. When his private part touched your private part, do you remember if it was inside?
A. I think he was a little bit from going, like not inside but, you know, and then my mom pulled up that time.
E.D.I further testified the defendant would try to get her not to tell by giving her money. On cross-examination, E.D.I testified that she remembered telling Ms. Ryals that "Pee Wee" (a family friend) "put his thing" in her butt, vagina, and mouth. When asked if "Pee Wee" had actually "stuck his thing" in her vagina and butt, E.D.I replied, "Yes." She also indicated that "Popcorn" (Uncle Larry's son) "stuck his private" in her "private" and "butt." Defense counsel then questioned E.D.I regarding whether the defendant penetrated her:
Q. I think, and it was hard for me to hear, but I think what you said was that he never stuck his private inside your private. Is that right?
A. Well, he got, like, very close.
Q. He got close to it but never stuck it inside?
A. Well, it was, like, that close. (Indicating.)
E.D.2 testified on direct examination at trial that the defendant touched her "in the wrong places," namely the "private part." The prosecutor showed E.D.2 drawings of a nude boy and a nude girl. E.D.2 was given a pen and asked to mark the part of the defendant's body he used to touch her "private part." E.D.2 circled the boy's penis, his hands, and his head. E.D.2 indicated this took place in her mother's bedroom when her mother was not there. She further testified there was a "dirty movie" on television, and the defendant took off both of their clothes. When asked where she was when the defendant touched his "private part" on her "private part," E.D.2 responded, "Laying on the bed." When asked what it felt like, E.D.2 responded, "It didn't feel good." She further testified the defendant told her not to tell anyone that he did this.
Detective Hartmann testified at trial that the defendant agreed to give her a recorded statement. Prior to giving the statement, the defendant was Mirandized. Detective Hartmann testified she knew the defendant had been out of rehab for a while, but he did not appear to be drunk or under the influence when he gave the statement. The audiotape of the defendant's statement was introduced at trial and played for the jury. A transcript of the statement was provided to the jury to assist them. In his statement, the defendant indicated he could not remember many things regarding the allegations of his sexual abuse of E.D.I and E.D.2. He stated he was addicted to pain medication and was taking more than the prescribed amount. He disclosed that his father raped him when he was in the sixth grade. During the questioning, while the defendant did not admit to sexually abusing E.D.I and E.D.2, he did not deny it. For example, Detective Hartmann asked, "And kind of confirming what [E.D.1's] saying has been happening with her since she was like 9. [Urn] Would you say that absolutely didn't happen and she's lying or what would you say to that?" The defendant responded, "it could be true if I was on pills. I mean I don't know you know I don't remember." When Detective Hartmann pointed out that E.D.I named the defendant as one of the people sexually abusing her, and that there was no reason for her to lie, the defendant responded, "I ain't saying that she's lying." Shortly thereafter, the following colloquy took place:
Hartmann: Ok so if each one of [them] said to me Borris [sic] stuck his penis in my butt, your [sic] saying their [sic] not lying about that?
Stogner: I ain't saying they lying.
Hartmann: Um-huh[.]
Stogner: I would just you know.
Hartmann: Who who did you do that to? That that's what I really need to get from you. I want you to validate to me what their [sic] saying. Cause [sic] if you don't then that they're lying.
Stogner: It probably if it did happen it might have been the two girls. Cause [sic] I don't I mean.
* * *
Hartmann: What about [E.D.I]?
Stogner: Like I said, if it if it did.
Hartmann: Not if not let lets [sic] [inaudible].
Stogner: If it did it could have been the two girls. There I don't I don't remember it you know.
Hartmann: Right. If [E.D.I] says that happen [sic] is she telling the truth?
Stogner: I ain't saying she lying.
Hartmann: But does that mean she's telling the truth?
Stogner: She yeah she could be telling the truth but.
Hartmann: What about [E.D.2]...
Stogner: The same thing.
Hartmann: You had sex with her.
Stogner: She could be telling the truth I mean you know.
At the close of the interview, Detective Hartmann asked, "But your [sic] not going to deny that if they're saying it happen[ed]?" The defendant responded, "No no I'm not denying it,"
The defendant testified on direct examination at trial that he was addicted to pain pills at the time he gave his statement to Detective Hartmann, and that he did not remember saying anything. He stated he had prior convictions for DWI and two counts of resisting arrest. He denied sexually abusing E.D.I and E.D.2. When defense counsel asked him why he did not simply tell Detective Hartmann that he did not do that, the defendant said because he was taking pain pills and did not know what he was saying. When asked why the girls accused him, the defendant replied that he believed his girls were coached into saying what they said.
The defendant suggests in his brief that E.D.I and E.D.2 were coached into accusing the defendant because they made no allegations of sexual abuse in their first CAC interviews. However, after over nine months of therapy, they accused the defendant of sexual abuse in the second CAC interviews. In his brief, the defendant asserts:
After nine months of counseling, numerous interviews, removal from their home and living with relative strangers, it is no wonder that the girls probably decided that the only way to make it end was to give the answers the State workers wanted to hear. By that time they knew what responses would get their approval.
In her first CAC interview, E.D.I did not disclose any sexual abuse regarding the defendant; yet several months later, after undergoing therapy, she disclosed at the second CAC interview how the defendant sexually abused her. Likewise, although E.D.2 spoke at her first CAC interview about seeing the defendant sexually abuse E.D.I, she indicated that nothing like that had happened to her. However, in her second CAC interview after months of undergoing therapy, E.D.2 disclosed how the defendant sexually abused her.
Dr. Atzemis testified about the disclosure process regarding a child that has been sexually abused. Out of naivety, embarrassment, or fear, a child might not disclose the abuse. Most children do not tell right away, but rather there is a time period or delay. This so-called "delayed disclosure" can be weeks, months, or years after the event. Dr. Atzemis further noted that recantation is a known phenomenon in child abuse. The main reason a child will recant is if she is taken away from her family, which is her only support. Dr. Atzemis also explained that early disclosure typically involves abuse by a stranger or someone who is unrelated to the child. However, the amount of time it takes to disclose definitely increases if the abuser is someone the child loves or who lives in the home. She further indicated that many children first choose to tell a friend or someone that they feel they can talk to. However, they reveal just little bits of information, waiting for a reaction before they decide to tell more.
When Detective Hartmann was under cross-examination, defense counsel wondered why, on several occasions, E.D.I and E.D.2 denied the defendant did anything bad to them. Detective Hartmann responded, "It's very typical of sexually abused children to do that." Rickels also testified that it is not unusual at all for a child to begin making disclosures after that child has been in counseling or foster care for a period of time. During her crossexamination, Case opined:
It is so much more difficult for kids who were abused by someone that's close to them to talk about what's happened. A lot of kids will even say, no, nothing happened. Nothing at all. And they take everything back because they don't want to hurt their family, and they would rather keep it a secret to themselves about what's happened, than mess up their family. This family went through horrible trauma being torn apart.
During trial, defense counsel asked Tadlock why E.D.I and E.D.2 disclosed more information about the sexual abuse during their July, 2006 CAC interviews than they did at trial. Tadlock responded, "Court proceedings are intimidating to adults, let alone children. And in that situation, it doesn't surprise me that they were having difficulty talking about things in detail."
When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La. 1984). In the instant matter, the defendant's hypothesis of innocence was based on his denial that he raped E.D.I and E.D.2, and that the girls alleged he raped them because they were coached into making the allegations. In finding the defendant guilty of two counts of aggravated rape, it is clear the jury resolved against the defendant any conflicts between the testimony of the defendant and E.D.I or E.D.2, as well as any apparent conflicts between the first and second interviews of E.D.I and E.D.2, or the interviews and trial testimony. See Captville, 448 So.2d at 679. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Quinn, 479 So.2d 592, 596 (La. App. 1st Cir. 1985). We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See State v. Mitchell, 99-3342 (La. 10/17/00), 772 So.2d 78, 83.
In finding the defendant guilty, it is clear the jury rejected the defendant's hypothesis of innocence. The jury's verdicts reflected the reasonable conclusion that, based on the testimony of E.D.I, E.D.2, Lisa Tadlock, Detective Hartmann, the CAC interviews, and the culpable remarks made by the defendant in his statement to Detective Hartmann, the defendant raped E.D.I and E.D.2. It is also obvious from the finding of guilt that the jury concluded that the testimony of these witnesses was more credible than the testimony of the defendant.
While there was no physical evidence to prove the rapes had occurred, as pointed out by the defendant, it is not necessary that there be physical evidence to prove the defendant committed aggravated rape. The testimony of the victim alone is sufficient to prove the elements of the offense. State v. Orgeron, 512 So.2d 467, 469 (La. App. 1st Cir. 1987), writ denied, 519 So.2d 113 (La. 1988). The testimonial evidence was sufficient to establish the elements of aggravated rape, specifically the element of penetration. LSA-R.S. 14:41(B) provides that "[e]mission is not necessary" and that "any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." See State v. Rives, 407 So.2d 1195, 1197 (La. 1981). Moreover, Dr. Atzemis testified that E.D.I and E.D.2 were taken to Children's Hospital, where they underwent physical examinations, on or about October 24, 2005. The children were removed from their home on September 28, 2005. Thus, assuming the sexual abuse continued to the latest possible day, it would have been almost a month from the time of the abuse until E.D.I and E.D.2 were physically examined. Dr. Atzemis testified that about 95% of the sexual abuse victims they see have a normal exam. The genitalia are designed in such a way, according to Dr. Atzemis, that there are very rarely scars for a doctor to see. Furthermore, if the last incident of sexual abuse had been at least a month prior to her visit, Dr. Atzemis would not expect to see tearing or physical evidence.
After a thorough review of the record, we are convinced that viewing the evidence in the light most favorable to the state, a rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the aggravated rape of E.D.I and the aggravated rape of E.D.2. Accordingly, this assignment of error is without merit.

SENTENCING ERROR
Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. LSA-R.S. 14:42(D)(1). In sentencing the defendant, the trial court failed to provide that the sentences were to be served at hard labor.[5] Inasmuch as an illegal sentence is an error discoverable by a mere inspection of the proceedings without inspection of the evidence, LSA-C.Cr.P. art. 920(2) authorizes consideration of such an error on appeal. Further, LSA-C.Cr.P. art. 882(A) authorizes correction by the appellate court.[6] We find that correction of these illegally lenient sentences does not involve the exercise of sentencing discretion and, as such, there is no reason why this court should not simply amend the sentences. See State v. Price, 05-2514 (La. App. 1st Cir. 12/28/06), 952 So.2d 112 (en banc), writ denied, 07-0130 (La. 2/22/08), 976 So.2d 1277. Accordingly, since sentences at hard labor were the only sentences that could be imposed, we correct the sentences by providing that they be served at hard labor.
CONVICTIONS AFFIRMED; SENTENCES AMENDED, AND AFFIRMED AS AMENDED.
NOTES
[1] Count 1 related to the aggravated rape of E.D., the older sister, and Count 2 related to the aggravated rape of E.D., the younger sister.
[2] A "protected person" means a person who is the victim of a crime under the age of seventeen years. See LSA-R.S. 15:283(E)(1).
[3] Dr. Atzemis testified she was with the Audrey Hepburn Care Center at Children's Hospital in New Orleans. The trial court accepted Dr. Atzemis as an expert in the field of pediatric medicine with a sub-specialty in forensic pediatrics.
[4] E.D.1's two CAC interviews and E.D.2's two CAC interviews were submitted into evidence at trial and played for the jury.
[5] The minutes reflect the trial court sentenced the defendant to hard labor for both the aggravated rape convictions. When there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La. 1983).
[6] "An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review." LSA-C.Cr.P. art. 882(A).